WIEKHORST BROTHERS EXCAVATING & EQUIPMENT COMPANY, A
GENERAL PARTNERSHIP, APPELLANT, V. OTTO LUDEWIG ET AL.,
APPELLEES.

529 N.W.2d 33

Filed March 10, 1995.   No. S-93-545.

Dan D. Stoller for appellant.

Thomas J. Guilfoyle, of Frost, Meyers, Guilfoyle & Govier, for appellees.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

LANPHIER, J.

Appellant, Wiekhorst Brothers Excavating & Equipment Company, brought this civil conspiracy action in the district court for Douglas County, Nebraska, against five individuals employed by the engineering firm of Lamp, Rynearson & Associates, Inc. Appellant claims that the five individuals, for their own personal motives, conspired to intentionally interfere with and destroy appellant's business by wrongfully recommending its termination from two sanitary and improvement district storm sewer projects. The district court granted appellees' motion for summary judgment. We affirm because there is no genuine issue of material fact. Appellees acted at all material times within the scope of their employment. As a matter of law, they therefore cannot be liable individually for conspiracy. We further hold that the district court did not err in admitting certain affidavits over appellant's hearsay objections.

## FACTS

This case involves a dispute between a contractor and five employees of an engineering firm. Appellant, Wiekhorst Brothers Excavating & Equipment Company, brought this action against appellees, Otto Ludewig, Michael McMeekin, Brett Wawers, Jeff Ray, and Loren Steenson, in their individual

capacities. The appellees are all employees of the engineering firm Lamp, Rynearson & Associates, Inc. (LRA).

LRA was employed as a design engineer on two unrelated projects by two sanitary and improvement districts (SID's) located in Douglas County. SID No. 337 employed LRA to design and assist in the construction of a public improvement, Storm Sewer Section I, within the Nelson Creek Subdivision in 1986. That same year, SID No. 291 employed LRA to design and assist in the construction of public improvements in the Pacific Meadows Subdivision.

LRA's duties required it to prepare the plans and specifications for the projects to be constructed by the two SID's. LRA's duties also included the preparation of contract documents and handling of the public bid-letting. In addition, LRA was required to ensure that the construction of the public improvements complied with the plans and specifications and the contract documents.

Appellee Ludewig was vice president and director of LRA and was the head of its construction administration division. Appellee McMeekin was the head of LRA's civil engineering department. Steenson was a civil engineer and was the project engineer for SID No. 337. Wawers was an engineer and was Ludewig's chief assistant in the construction administration division. Ray was an engineer and was LRA's construction observer on the SID No. 337 project.

Appellant was the low bidder for Storm Sewer Section I of SID No. 337. Storm Sewer Section I involved the construction of a storm sewer following the alignment of a tree-lined intermittent creek. Preserving the greatest number of trees possible was considered essential to the project, which centered around maintaining the natural beauty of the subdivision.

Appellees allege that the quality of appellant's work suffered from the beginning of the project. Some of these allegations are recounted below with appellant's responses.

Appellee Steenson avers that he observed several problems. The pipes were not properly aligned either vertically or horizontally, dirt was being removed from adjacent building lots, and trees marked for preservation were being damaged or destroyed. Appellant admits that it damaged and removed trees

which were marked to be saved, but claims that it was going to compensate the developer by paying liquidated damages. Appellant admits that it removed substantial amounts of dirt from adjacent building lots, but states that it was going to replace the dirt at a later time.

Part of the project called for 72-inch equivalent horizontal elliptical reinforced concrete pipe. The 72-inch pipe was difficult to lay. It is elliptical and therefore relatively flat on both the top and the bottom. One end of the pipe has a male coupler and the other end of the pipe has a female coupler. Those sections must be pushed together to make a tight fit. A number of the sections had unacceptable gaps, in excess of 1 inch. Appellant was repeatedly asked to fix the gaps by pouring concrete collars around the joints. Prior to fixing the gaps and pouring concrete collars, appellant covered the pipe with dirt, including most of the defective pipe. Appellant admits that many of the joints between the pipes were faulty, but states that it was going to go back and fix the joints at a later time.

The contract required the pipe to be laid on a crushed rock bed, and the pipe and the rock bed to be encased in a geotechnical cloth material to provide stability to the pipe sections. Ludewig called Michael Siedschlag from Geotechnical Services, Inc., and Scott Wiekhorst to the jobsite on October 17, 1986. Siedschlag determined that appellant was not laying the rock bed correctly and that water was not being pumped from the trench. Siedschlag suggested several corrective measures, none of which were taken by appellant.

On or about November 3, 1986, vandals damaged most of the pipe remaining to be laid. Ludewig; the concrete supplier, Hydro Concrete; and Scott Wiekhorst met. Ludewig concluded that the problem could be corrected by turning over the pipe and repairing the top part. When Ludewig returned to the jobsite later in the day, he discovered that appellant was merely throwing the pipe into the trench and was not repairing the broken portion of the pipe.

A survey of the site was performed on or about November 3, 1986, and it was determined that the storm sewers were off line horizontally and vertically. Appellant admits that the storm sewer pipe was out of vertical and horizontal alignment but

blames LRA for specifying the wrong amount of rock base and improper staking.

Ludewig and LRA's president and a member of its board of directors, Gary Kathol, discussed the problems and determined to contact the representatives of SID No. 337. A meeting was held at LRA on November 4, 1986. The meeting included Kathol and appellees Ludewig, McMeekin, Steenson, and Wawers. In attendance were Pat Jacobs, chairman of SID No. 337, Steve Jacobs, clerk of the SID, and John Rickerson, attorney for the SID.

The various problems were discussed. According to appellees' affidavits, Ludewig suggested that appellant be given an opportunity to cure the defects, but also stated that it was his opinion that appellant did not have the capability and/or willingness to make the necessary corrections. All of LRA's employees agreed that some action had to be taken and that termination was justified from an engineering standpoint. Rickerson, the SID's attorney, stated that he believed that immediate termination was justified under the circumstances. Some discussion was had as to whether the contract required notification of the defects and time to cure prior to termination. Based upon LRA's opinion that permissible grounds for termination existed, and with the legal advice of its attorney, SID No. 337 terminated appellant from the job.

LRA encountered difficulties with appellant a second time in 1986 on another SID project. LRA was the engineer for a storm sewer project to be constructed by SID No. 291, and appellant was the successful bidder. The third and most difficult phase of the project involved a crossing under the Union Pacific Railroad main line and a merger with a storm sewer system in the Papio Creek. The feared risks, if the work was done improperly, included collapse of the railroad track. LRA was concerned about appellant's capability to successfully tunnel under the railroad's main line. However, appellant informed LRA that it was going to engage an experienced subcontractor to do the tunneling work during Phase III.

The contract documents required that appellant provide special public liability insurance to protect against the risk to the railroad's main line. On November 26, 1986, Ludewig, on

behalf of LRA, wrote to appellant setting forth the insurance requirements. Appellant needed to provide liability insurance in an amount not less than $2,000,000 per person and $6,000,000 per accident and property damage in an amount not less than $6,000,000. Ludewig demanded that appellant produce proof of insurance within 10 days. Appellant claims that there was some confusion regarding the required amount of insurance prior to November 26 and that this confusion delayed the procurement of insurance. Appellant never produced a certificate of insurance. Appellant responds that it did obtain a quote from an insurance company on January 6, 1987.

As the time approached to begin the tunneling under the railroad's main line, appellant informed Ludewig that it had decided not to bring in an experienced subcontractor and that it was going to perform the tunneling work itself. LRA was convinced that appellant could not properly and safely tunnel under the Union Pacific main line and was concerned about its duty to its client and the public. The board of directors of LRA met with its corporate attorney, John Ford, and decided that LRA should advise SID No. 291 that if appellant was permitted to do the tunneling, LRA could not act as engineer for the SID. Kathol, as president of LRA, was instructed by the board of directors to attend the next SID meeting. At the SID board meeting on December 12, 1986, Kathol notified the SID that LRA would withdraw as engineer for Phase III of the project if appellant was permitted to act as the contractor responsible for the tunneling work. SID No. 291 terminated appellant and finished the job with another contractor.

Appellant filed a petition in the district court for Douglas County on August 10, 1987. Appellees' demurrers to this petition, and three subsequent petitions, were sustained. On September 5, 1990, appellant filed a fourth amended petition. In so doing, appellant attempted to add a new defendant, Kathol.

The fourth amended petition alleged two causes of action. For its first cause of action, appellant alleged that "the Defendants, having entered into a mutual agreement and acting with a common purpose, have engaged in actions that constitute a conspiracy to intentionally harm and injure the Plaintiff by

disrupting the business operations of the Plaintiff and damaging the business reputation of the Plaintiff." Appellant further alleged that "as a direct and proximate cause of the actions of the Defendants, and each of them, the Plaintiff has suffered a pecuniary loss of profits from and after November 4, 1986 and a pecuniary loss for damage to its business reputation."

Appellant's second cause of action alleged that each of the defendants, by virtue of their employment by LRA, had a contractual duty to appellant to accurately design and survey the storm sewer projects. Appellant alleged that the defendants failed to perform their duties with reasonable care and diligence and that such failure constituted negligence.

Appellees again demurred. Kathol, the newly named defendant, demurred on the basis that all of the allegations contained in the fourth amended petition were barred against him pursuant to the statute of limitations for professional negligence, Neb. Rev. Stat. § 25-222 (Reissue 1989). The other defendants, appellees in this action, demurred to appellant's second cause of action for the reason that it was also barred by § 25-222.

The trial court sustained both demurrers, from which no appeal is taken. Appellees then answered the allegations of the first cause of action of appellant's fourth amended petition on March 12, 1992. Appellees admitted that they were employees of LRA, but denied all other material facts. Appellees asserted an affirmative defense that as employees of LRA, they acted at all times within the scope of their employment and for the benefit of and on behalf of their employer and thus were incapable of conspiring with each other. Appellees further asserted that they were protected by a quasi-judicial privilege afforded design professionals.

On November 19, 1992, appellees filed a motion for summary judgment. On February 26, 1993, proceedings were had before the district court, and depositions and affidavits were submitted by both parties. Appellant objected to the introduction of various affidavits offered by appellees on the basis of hearsay and foundation. The court reserved ruling on appellant's objections. On May 28, the district court, without explanation, overruled appellant's hearsay objections and granted appellees'

motion for summary judgment. From that order, appellant has appealed.

## ASSIGNMENTS OF ERROR

Appellant contends that the district court erred by granting summary judgment in favor of appellees when there remained a genuine issue of fact as to the following: (1) whether appellees acted outside the scope of their employment, (2) whether appellees' actions in recommending that appellant be terminated from the SID No. 337 contract without written notice of the right to cure exceeded their qualified privilege to give advice to SID No. 337, and (3) whether appellees' recommendations to their corporate employer that LRA threaten to resign from the SID No. 291 project unless appellant was terminated exceeded their qualified privilege to give advice to SID No. 291.

Appellant further assigns as error the trial court's admission, over appellant's objections, of affidavits offered by appellees for the reason that those affidavits contained inadmissible hearsay statements.

## STANDARD OF REVIEW

Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Heath Consultants v. Precision Instruments, ante* p. 267, 527 N.W.2d 596 (1995); *Huntwork v. Voss, ante* p. 184, 525 N.W.2d 632 (1995). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Huntwork v. Voss, supra*; *New Light Co. v. Wells Fargo Alarm Servs., ante* p. 57, 525 N.W.2d 25 (1994).

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in the admissibility of evidence. *Kroeger v. Ford Motor*

*Co., ante* p. 323, 527 N.W.2d 178 (1995); *Terry v. Duff*, 246 Neb. 524, 519 N.W.2d 550 (1994). The admission of hearsay is controlled by the Nebraska Evidence Rules. See *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

## ANALYSIS

### CONSPIRACY TO INTERFERE WITH BUSINESS

In its fourth amended petition, appellant alleged that appellees entered into a mutual agreement and engaged in actions that constitute a conspiracy to intentionally harm and injure appellant by disrupting its business operations. Only the six employees were named as defendants, and the corporation itself was not charged with conspiracy.

Appellees asserted two affirmative defenses. First, they state that at all times material to appellant's allegations, they were employees of LRA and acted within the scope of their employment. Further, appellees asserted that all of their actions within the scope of their employment were justified actions protected by a privilege afforded design engineers.

A conspiracy to unlawfully injure another's business is actionable. *Diesel Service, Inc. v. Accessory Sales, Inc.*, 210 Neb. 797, 317 N.W.2d 719 (1982). A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means. *Treptow Co. v. Duncan Aviation, Inc.*, 210 Neb. 72, 313 N.W.2d 224 (1981); *Dixon v. Reconciliation, Inc.*, 206 Neb. 45, 291 N.W.2d 230 (1980); *Peters v. Woodman Accident & Life Co.*, 170 Neb. 861, 104 N.W.2d 490 (1960).

The necessary elements of tortious interference with a business relationship or expectation are (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991).

As more fully discussed below, appellant's argument that the

LRA employees conspired to interfere with its business relationships fails for two reasons. First, there is absolutely no evidence that the employees acted outside the scope of their employment with LRA, and therefore, there is no showing of conspiracy. Each appellee has submitted an affidavit describing his duties and responsibilities as an employee or officer of LRA. For example, appellee Ludewig stated that his responsibilities entailed representing the owner during the construction phase of the project and advising and consulting with the owner. Appellee Steenson stated he participated in the preparation of the plat for SID No. 337. All appellees aver that their actions were within the scope of their employment.

Despite bare allegations in appellant's pleadings, appellant failed to offer any evidence to indicate that any appellee acted outside the scope of his employment with LRA. Without some evidence that appellees acted outside the scope of their employment for LRA, there can be no conspiracy.

A corporation cannot conspire with an agent when the agent is acting within the scope of his or her authority. Corporations act through their agents, and the acts of an agent are the acts of the corporation. *Renner v. Wurdeman*, 231 Neb. 8, 434 N.W.2d 536 (1989). See, also, *Dixon v. Reconciliation, Inc., supra*. It follows that if all of a corporation's agents are acting within the scope of his or her authority, their acts are acts of the corporation and there is only one actor.

However, the gist of a civil conspiracy action is not the conspiracy charged, but the damages the plaintiff claims to have suffered due to the wrongful acts of the defendants. *Treptow Co. v. Duncan Aviation, Inc., supra*; *Trebelhorn v. Bartlett*, 154 Neb. 113, 47 N.W.2d 374 (1951). Failure to prove a conspiracy is of no consequence if the plaintiff is able to establish that one or more defendants committed wrongful acts resulting in damages. *Treptow Co. v. Duncan Aviation, Inc., supra*; *Trebelhorn v. Bartlett, supra*. As the design engineer, LRA was required to act as a consultant and advisor to the owners, the SID's, with regard to the construction projects. Appellant argues that by recommending its termination from the two projects, LRA exceeded the scope of its privilege to give advice to the owners and committed wrongful acts.

One of the basic elements of tortious interference with a business relationship requires an intentional act which induces or causes a breach or termination of the relationship. *Renner v. Wurdeman, supra*; *Miller Chemical Co., Inc. v. Tams*, 211 Neb. 837, 320 N.W.2d 759 (1982). An intentional, but justified, act of interference will not subject the interferer to liability. *Matheson v. Stork, supra* (citing and clarifying *Miller Chemical Co., Inc., v. Tams, supra*). See, also, Restatement (Second) of Torts § 770 (1979); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 129 at 983 (5th ed. 1984). For example, where a lender gave notice to a debtor's suppliers that it would no longer provide floor–plan financing to the debtor, we held that there was no improper act of interference with the debtor's business. *DeLay First Nat. Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976).

We have not previously addressed whether there is any privilege afforded design professionals; however, other courts have done so. Those courts have held that design professionals acting within the scope of their contractual obligations to the owner cannot be liable for advising the owner to terminate a relationship with the contractor, unless the design professionals act in bad faith or with malice. *Dehnert v. Arrow Sprinklers, Inc.*, 705 P.2d 846 (Wyo. 1985); *Kecko Piping Co. v. Monroe*, 172 Conn. 197, 374 A.2d 179 (1977); *Ballou v. Basic Construction Company*, 407 F.2d 1137 (4th Cir. 1969).

We hold that design professionals acting within the scope of their contractual obligations are privileged to give the owner advice which may lead to the termination of a contractor. Absent a showing of bad faith or malice, a design professional's intentional, but justified, act of interference will not subject it to liability for tortious interference with business.

Here, appellant argues that by recommending its termination from the two projects, LRA exceeded the scope of its privilege to interfere and to give advice to the owners. LRA is not a defendant. The privilege afforded design engineers inures to LRA, rather than appellees. However, as we stated above, all acts material to this action were within the scope of appellees' employment. If LRA did not exceed the scope of its privilege, neither did appellees.

The contract documents for Storm Sewer Section I for SID No. 337 were offered into evidence by appellees. Article 9 defines the engineer's status during construction and provides that the engineer will be the owner's representative during the construction period. Further, the engineer's efforts were to be

directed toward providing for OWNER a greater degree of confidence that the completed Work will conform to the Contract Documents. On the basis of . . . visits and on–site observations as an experienced and qualified design professional, ENGINEER will keep OWNER informed of the progress of the Work and will endeavor to guard OWNER against defects and deficiencies in the Work.

Again, LRA is not a party. Yet while appellant pleads that appellees acted outside the scope of their employment with LRA, appellant argues on the other hand that LRA, through its agents, exceeded its privilege to give advice to SID No. 337 by failing to insist that SID No. 337 follow the requirements of the contract and give appellant notice of the defects and an opportunity to cure. However, at the November 4 meeting, the engineers were asked to determine, from an engineering standpoint, whether the contractor deserved to be terminated. The engineers determined that appellant was not performing, that its work would have to be redone, and that grounds for termination existed. Once that recommendation was made, it was up to the attorney for SID No. 337 to determine the legal and appropriate method of termination. Appellant speculates in its brief regarding possible motives which might show that appellees acted with malice or bad faith and therefore outside the scope of their employment. Assuming, arguendo, that malice and bad faith would be outside the scope of appellees' employment, appellant offers no evidence to support such a finding. LRA, by and through appellees, acted within the scope of its privilege in recommending that SID No. 337 terminate appellant. Since appellees were within the scope of their employment, their actions are also privileged.

Similarly, LRA, by and through appellees, acted within its privilege and with justification when it informed SID No. 291 that it would not act as design engineer if appellant was

permitted to tunnel under the Union Pacific main line. Appellant had failed to procure required insurance and had indicated that it would do the tunneling itself, rather than use an experienced subcontractor as earlier promised. It appears that LRA was justifiably concerned for its own exposure to liability. LRA's board of directors determined that the company would refuse to act as design engineer, only after consulting with its corporate counsel. LRA communicated its decision to SID No. 291's board of trustees, through its president. Again, appellant offers no evidence that any of LRA's employees or agents acted outside the scope of their employment with LRA.

The evidence indicates that appellees acted at all times within the scope of their employment and that LRA acted at all times within the scope of its privilege to give advice to SID No. 337 and SID No. 291. Accordingly, appellees were entitled to summary judgment in their favor as a matter of law.

## HEARSAY

Appellant further assigns as error the trial court's admission, over appellant's objections, of affidavits offered by appellees for the reason that those affidavits contained inadmissible hearsay statements.

At the hearing on the motion for summary judgment, appellant objected to the admissibility of portions of appellees' affidavits for the reason that the affidavits contained hearsay. For example, appellant argued that Ludewig's statements in his affidavit regarding the fact that appellant had been told not to remove dirt and regarding a conversation between Ludewig and appellee Jeff Ray were hearsay and lacking in foundation. Appellees argued that the affidavits were not hearsay, but were offered in support of appellees' defense that they were protected by a quasi-judicial privilege afforded design engineers or because they were based on firsthand knowledge. The trial court admitted the affidavits over appellant's objections.

Out-of-court statements, if not offered for the purpose of proving the truth of the facts asserted, are not hearsay. Neb. Rev. Stat. § 27-801 (Reissue 1989). Here, the out-of-court statements were offered to show the state of mind on the part of appellees, rather than the truth of the matter asserted.

Therefore, the district court properly admitted the affidavits of appellees.

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court granting summary judgment in favor of appellees.

AFFIRMED.