IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


ARR ROOFING V. NEBRASKA FURNITURE MART


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


ARR ROOFING, L.L.C., ALSO KNOWN AS BOONE BROTHERS ROOFING, APPELLANT,

V.

NEBRASKA FURNITURE MART, INC., A NEBRASKA CORPORATION,
AND BENCHMARK, INC., AN IOWA CORPORATION, APPELLEES.


Filed July 2, 2019.    No. A-18-284.


Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed.

Heather S. Voegele-Andersen and Gretchen L. McGill, of Dvorak Law Group, L.L.C., for appellant.

Brian T. McKernan and Nicole K. Griffard, of McGrath, North, Mullins & Kratz, P.C., L.L.O., for appellee Nebraska Furniture Mart, Inc.

Thomas J. Guilfoyle and Nicholas F. Sullivan, of Erickson Sederstrom, P.C., for appellee Benchmark, Inc.


PIRTLE, ARTERBURN, and WELCH, Judges.

PIRTLE, Judge.

### INTRODUCTION

ARR Roofing, L.L.C. (ARR), appeals from an order entered in the district court for Douglas County which granted summary judgment in favor of Nebraska Furniture Mart, Inc. (NFM), and Benchmark, Inc., for claims of breach of contract, breach of implied covenant of good

faith and fair dealing, fraudulent and negligent misrepresentations, and tortious interference. ARR argues that the district court erred in granting the summary judgment for breach of contract, in finding that NFM and Benchmark acted in good faith, in finding that there were no misrepresentations, and in finding that Benchmark was entitled to the design professional's privilege. For the reasons that follow, we affirm.

BACKGROUND

NFM is a business located in Douglas County, Nebraska. In May 2013 it contracted with Benchmark, a roofing design and consulting firm, to provide NFM with roof management and consulting services for a roofing project. Pursuant to this agreement, Benchmark prepared the bid documents including the drawings and specifications of the new roof as well as the contract. These drawings and specifications showed the work that needed to be completed on the roof. Included in these drawings was a generic drawing of the decking, a part of the building that the roof is attached on to, to demonstrate where fasteners should be placed. Part of the project would also include repairing and cleaning the decking. However, as the condition of the decking could not be viewed until after the roof was removed, estimates were made in the contract with a provision that adjustments would be made after the condition of the decking was determined.

On August 23, 2013, NFM, Benchmark, and ARR all attended an on-site pre-bid meeting for the project. At least some of the underside of the decking was viewable at that time as part of the building did not have a drop ceiling. ARR submitted its bid for the project and NFM accepted the bid, entering into a contract agreement on or about September 12, 2013 (Contract). Benchmark was not a party to this Contract.

Initially work was to commence on September 30, 2013. NFM then requested a delay until spring 2014, to which ARR assented. Work on the project began in late May 2014. ARR encountered two major issues once work began. First, the decking had a substantially greater amount of rusting than initially planned for in the Contract. Second, it was discovered that the decking, as depicted in the generic drawings, was different than the decking currently in place. As a result, in order to attach the roof properly, ARR was required to expand the bottom deck flutes by hand. This additional work was agreed to in Change Directive No. 1 which specified the per hour cost, but not the total number of hours or cost. Ultimately, the project was completed. Benchmark and NFM issued Change Order No. 1 on or about December 12, 2014, which included all of the previous change directives and provided the total additional expense that would be included in the contract price. ARR signed off on Change Order No. 1 and subsequently submitted an application and certificate for payment which included the amount on Change Order No. 1 and showed that there were no additional funds due under the Contract. However, on April 29, 2015, ARR submitted a letter to NFM requesting adjustment to the final cost of the project for additional work. A check was ultimately issued by NFM and cashed by ARR for the amount requested by ARR on its final application and certificate for payment; however, the check was not issued until after ARR submitted its request for an adjustment.

ARR subsequently filed a complaint on July 2, 2015, alleging that NFM and Benchmark had breached the Contract, breached the implied covenant of fair dealing and good faith, and made negligent and fraudulent representations. An amended complaint was filed on July 27, 2017. NFM

and Benchmark each filed a motion for summary judgment on September 29, 2017. A hearing was held on December 15, 2017, at which time evidence was submitted. The district court issued an order on February 26, 2018, granting NFM and Benchmark's motions for summary judgment on all causes of action. It is from this order that ARR appeals.

## ASSIGNMENTS OF ERROR

On appeal, ARR assigns, consolidated, renumbered, and rephrased, that the district court erred in (1) granting summary judgment in favor of NFM and Benchmark for breach of contract, (2) finding that NFM did not breach its contract or the implied warranty, (3) finding that ARR is estopped from claiming breach of contract, (4) finding that ARR agreed to Change Order No. 1 and cannot seek additional compensation for the additional work, (5) finding that ARR's acceptance of payment pursuant to Change Order No. 1 constitutes accord and satisfaction, (6) finding that ARR was not entitled to a 25-percent markup for any additional work required, (7) granting summary judgment in favor of NFM and Benchmark for fraudulent and negligent misrepresentation, and (8) finding Benchmark was a design professional acting within the scope of its contractual obligations and was entitled to the design professional's privilege.

## STANDARD OF REVIEW

In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Durre v. Wilkinson Development*, 285 Neb. 880, 830 N.W.2d 72 (2013).

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and evidence show that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitle to a judgment is a matter of law. *Id.*

## ANALYSIS

*Breach of Contract, Implied Covenant of Fair Dealing, and Estoppel.*

ARR alleges that the district court erred in granting summary judgment on its claims for breach of contract and breach of implied warranty regarding NFM. The crux of ARR's claim is that the Contract was ambiguous as to whether it included or excluded the design documents provided to them as part of the bidding process which were inaccurate as to the actual condition and design of the decking on the roof and ultimately required the changes and additional work performed. ARR further argues that the district court erred in finding that it was estopped from pursuing its breach of contract claim on the basis there was a question of fact as to whether the elements of estoppel were met regarding its claim for damages based upon the delays in the commencement of the project.

Whether a contract is ambiguous is a question of law. *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993). A contract is ambiguous if a word, phrase, or provision in the document has, or is susceptible to, at least two reasonable but conflicting interpretations. *Id.* If a contract is ambiguous, the meaning of the contract is a question of fact. *Id.*

Sections 1.A. and 2.A. of the Contract state:

1. <u>The Contract Documents</u>

A. "Contract Documents" mean and consist of: (A) this Agreement; the Bid Documents, including (B) the Project Manual; (C) the General Conditions of the Contract; (D) Amendments to this Agreement and to the General Conditions of the Contract, if any; (E) the Drawings; (F) the Specifications; (G) Revisions, if any, to the Drawings or the Specifications; (H) all Addenda; (I) the Pre-Bid Meeting Minutes; and (J) Modifications, if any. Any of the foregoing documents may herein be known individually as "a part of the Contract"; several or all of the foregoing documents may also herein be known as "the parts of the Contract"; and the entire group of documents as "The Contract Documents."

2. <u>Knowledge of the Contract Documents</u>

A. Contractor acknowledges that prior to signing this Agreement, Contractor has examined the Contract Documents, including but not limited to all plans and specifications for the Work to be performed hereunder, including the general conditions of the Contract between Owner and Contractor (General and Other Conditions), drawings and addenda which, as they apply to Contractor's Work, are a part of this Agreement the same as if fully set out herein. Contractor accepts the provisions of said documents and agrees to be governed by and to perform the Work provided hereunder in strict accordance therewith.

The inclusion of the design documents are further specified in Section 20.A. of the Contract, which provides:

20. <u>Document Identification</u>

A. The parts of the Contract which constitute the entire Agreement between Owner and Contractor are listed in paragraph 1 hereof and, except for amendments, modifications and revisions issued after execution of the Agreement, are enumerated as follows:

1. This Agreement between Owner and Contractor.

2. The Project Manual for Project No. NFMOMAH001B, including:

a) General Conditions of the Contract

b) The Drawings

c) The Specifications

d) All Addenda

e) The Pre-Bid Meeting Minutes.

ARR argues that these paragraphs required the inclusion of the design documents provided by Benchmark which contained the generic decking information and did not represent the actual condition of the decking. Further, ARR argues this creates ambiguity when the Contract requires ARR to perform the work "in strict accordance" with documents that are not accurate, thus creating a question of fact as to the meaning of the Contract which must be resolved before it can be determined if the Contract was breached.

NFM argues that an additional section of the Contract is necessary in the interpretation of the above referenced provisions. Article 2.11 provides in part:

A. In the event the Contractor is furnished any building condition data, prior to, at, or after the Contractor has signed the Agreement, or in the event the Drawings or Specifications contain any building condition data, such data shall not be part of the Contract and is hereby excluded therefrom. There shall be a constructive presumption that the Contractor did not rely on such data, but at his own risk utilized such data in conjunction with any investigations and inspections of building prior to, at, or after the signing of the Agreement. By signing the Agreement, the Contractor represents to the Owner that (1) he has not relied upon such building condition data, if any, (2) he has conducted building condition investigations and inspections and has correlated his knowledge, and inferences therefrom, with the Work intended by the Contract, and (3) there are no building conditions which preclude, limit, or adversely affect either the performance of Work for the contract Sum within the Contract Time or any guarantees, warranties or the like, except for latent conditions underneath the existing roof which could not be reasonably anticipated by the examination of core samples, or the visual inspection ordinarily employed in the single-ply roofing trade.

The district court cited this provision in its order when it found that NFM did not breach the Contract by failing to provide accurate design documents.

We agree with the district court. When examining a contract, whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses. *Tierney v. Four H Land Co.*, 288 Neb. 586, 852 N.W.2d 292 (2014). While the provisions of the Contract cited by ARR could be read to create ambiguity, when read in conjunction with Article 2.11 A. the ambiguity is dispelled. The Contract specifically contemplated that the parts of the design documents that included building condition data would be excluded and called for ARR to not rely on that information in formulating its bid, noting that latent conditions underneath the roof could impact the construction. Further, Darrell Smith, an expert provided by ARR, who has served as a consultant on roofing projects, stated that it is common for these type of plans to be provided to contractors in the roofing industry. Considering Article 2.11 A. and the deposition of Smith, we find that NFM did not breach the Contract by providing the design documents with generic information and, therefore, we affirm the order of the district court on that issue.

ARR also alleges that the district court erred in finding that ARR was estopped from claiming that NFM breached the Contract by failing to pay for expenses incurred after the project was delayed twice. The district court specifically found that ARR was estopped from claiming that NFM had breached the Contract by delaying the start date as Richard Boone, a partner in ARR's business, agreed to the delay. "Estoppel" is a bar which precludes a party from denying or asserting anything contrary of that which has been established as truth by his own deed, acts, or representations, either express or implied. *Jennings v. Dunning*, 232 Neb. 366, 440 N.W.2d 671 (1989). We concur with the district court that ARR was estopped from claiming damages from the delays in the project as they consented to the delays and cannot now claim a position to the contrary. Thus, NFM did not breach the Contract by denying payment for such delays.

ARR also alleges that the district court erred in finding that NFM did not breach the implied covenant of good faith and fair dealing by providing the generic design documents and in failing

to pay for the delay in the project. The district court determined that this argument was, in essence, a restatement of the earlier breach of contract claims and found that NFM did not act in bad faith. The implied warranty or covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

> The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party. A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract. The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.

*Id.* at 843-44, 845 N.W.2d at 263. The question of a party's good faith in the performance of a contract is generally a question of fact. *RSUI Indemnity Co. v. Bacon*, 282 Neb. 436, 810 N.W.2d 666 (2011).

As an initial issue, while ARR argues in its brief that both NFM and Benchmark acted in bad faith, we note that ARR assigned error only to the implied warranty claim against NFM. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *White v. White*, 271 Neb. 43, 709 N.W.2d 325 (2006). As such, we do not address the implied warranty claim against Benchmark.

ARR argues that as the question of a party's good faith is a question of fact, it was improperly decided by the district court on summary judgment. Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute, and if a genuine issue of fact exists, summary judgment may not properly be entered. *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014). We agree with the district court that there was no material issue of fact as to whether NFM acted in good faith based on the evidence discussed in the respective breach of contract claims. The provisions of the Contract spell out that the building condition data was excluded. Further, Smith testified that providing generic documents, as NFM did, is common in the roofing industry. Thus, there was no material question of fact regarding NFM's actions. Similarly, with regard to the delay, Boone consented to the delay despite the Contract provision that ARR agreed to which would waive the claim for expenses for that delay. Given these facts, there is no material question of fact, and it is clear that NFM acted fairly within the terms of the Contract. Therefore, we affirm the district court's order as to the implied warranty claims.

*Claims Regarding Change Order No. 1.*

ARR next argues that the district court erred in finding that there had been no breach of contract based on the failure of NFM to pay for additional work, in finding that ARR agreed to Change Order No. 1, that ARR's acceptance of payment pursuant to Change Order No. 1

constitutes accord and satisfaction, and in finding that ARR was not entitled to the contractual 25-percent markup for the additional work.

Change Order No. 1 was the final adjustment for all additional work on the project, totaling $82,572.20, which included the work discussed in Change Directive No. 1, and was prepared after the roof was completed. Change Order No. 1 was signed by ARR on December 12, 2014. ARR then submitted an application and certificate for payment on December 16, 2014, adding the same amount that was stated in Change Order No. 1 to the Contract total and requesting $87,507.22. Of particular note, this application and certificate for payment said that the time period was the "end" and that the balance to finish, plus retainage, line was zero. It was not until April 29, 2015, that ARR submitted a letter to NFM requesting adjustment to the final cost of the project for additional work. A check was ultimately issued by NFM and cashed by ARR for $87,507.22; however, the check was not issued until after ARR submitted its request for an adjustment.

The district court found that ARR did not dispute the amounts in Change Order No. 1 or indicate that additional amounts were due and, having agreed to those terms, it could not now seek additional compensation. While we acknowledge that ARR raised the issue of an adjustment prior to NFM sending the check from the last application and certificate for payment, we ultimately concur with the district court. Article 7.01 B. provides,

> [ARR] warrants and represents to [NFM] that title to all Work, materials, and equipment covered by an Application for Payment, whether incorporated into the Work or not, will pass to [NFM] upon the receipt of such progress payment by [ARR], free and clear of all liens, claims, security interests, or encumbrances.

ARR acknowledged the sums of Change Order No. 1 by signing the document. The final application and certificate for payment clearly indicated that there was no other money owed under the Contract when it was submitted by ARR. Finally, although ARR had, by this time, raised its complaints regarding Change Order No. 1 to NFM, it accepted the final progress payment and cashed it, transferring all remaining work to NFM free and clear of all claims. Given ARR's actions, we cannot say that it has created a material question of fact regarding its acceptance of the totals for Change Order No. 1 after it submitted an application and certificate for payment showing no other money owed. The Contract was completed, title transferred, and ARR cannot now insist that it is entitled to additional funds. Therefore, the order of the district court is affirmed as to the breach of contract claim for additional amounts due.

We note here that the district court did not specifically address accord and satisfaction. As the issue of additional money due is resolved under the terms of the Contract, there is no need for us to address the argument of accord and satisfaction.

With regard to the 25-percent markup, ARR argues in its brief that it is only alleging that item four of Change Order No. 1 did not have the appropriate markup applied. This item was the 81 hours of labor which was charged at $65 per hour for a total of $5,265. The cost for labor was set at $65 per hour in Change Directive No. 1 which noted that it included both "hourly overhead and labor rate." The district court found that this amount included the required 25-percent markup provided for by the Contract as there was an absence of evidence that it did not. We note that not only did ARR agree with that number when it was initially established, it did not challenge its use

in Change Order No. 1 when it signed off on it. There is no evidence in the record to suggest that this per hour amount did not include the 25-percent markup. As such, we concur with the district court and affirm its order that the markup was already included in the $65 per hour cost.

*Fraudulent and Negligent Misrepresentation Claims.*

ARR alleges that the district court erred in finding that neither NFM nor Benchmark acted negligently and fraudulently in providing the generic design documents. To state a claim for fraudulent misrepresentation, a plaintiff must allege (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result. *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 285 Neb. 48, 825 N.W.2d 204 (2013). Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation with the exception of the defendant's mental state. *Id.*

The district court found that there was no representation and, even if there was a representation, ARR was not reasonable or justified in its reliance on such representation. The district court examined the same evidence as it did in the breach of contract claim. It noted that the Contract documents themselves provided that ARR should not rely on any representations of building conditions and that Smith had stated that such generic documents are common in the roofing industry. We have also examined and concurred with that same evidence in addressing the breach of contract claims. Given that the Contract excluded the building condition data, there could be no representation as to this data. Further, in signing the Contract, ARR acknowledged that it had not relied on any building condition data and that it had examined the roof. As such, even if there was a representation, ARR was not justified or reasonable in relying on it. Therefore, we affirm the district court's order as to the claims of negligent and fraudulent misrepresentation against both NFM and Benchmark.

*Design Professional's Privilege.*

ARR's final allegations are that the district court erred in finding that Benchmark was a design professional acting within the scope of its contractual obligations, in finding that Benchmark was entitled to the design professional's privilege, and in granting summary judgment for Benchmark as to the tortious interference claim. ARR's argument is that Benchmark exceeded the scope of its authority by controlling the means and methods by which ARR performed the work on the project.

A design professional's intentional, but justified, act of interference will not subject it to liability for tortious interference with business absent a showing of bad faith or malice. *Wiekhorst Bros. Excav. & Equip. v. Ludewig*, 247 Neb. 547, 529 N.W.2d 33 (1995). Design professionals acting within the scope of their contractual obligations are privileged to advise an owner regarding a contractor's performance. *Id.*

Benchmark's contract with NFM provides that "[Benchmark] shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences

or procedures, or for safety precautions and programs in connection with the work since these are solely [ARR's] rights and responsibilities." What Benchmark was able to do was monitor compliance with the Contract, prepare change orders, and review applications for payment. ARR notes that Benchmark was tracking time spent on expanding the flutes. Further, when issues arose regarding asphalt on the building, Benchmark made specific recommendations in order to ensure the roof met its requirements after it determined that the current method would not remove all the asphalt.

The district court found that Benchmark was a design professional, that it acted within the scope of its contractual obligations, and that any interference did not have malice or bad faith behind it. We agree with the district court. All of Benchmark's actions fall within its contractual obligations of monitoring compliance with the Contract, such as ensuring that all asphalt was removed, or preparing change orders, such as tracking the time spent. As such, Benchmark was entitled to the design professional's privilege regarding any of its recommendations for the change order or on compliance with the Contract. Further, there was no evidence presented that any such interference was done with malice or in bad faith. Therefore, we affirm the district court's determination that Benchmark did not tortuously interfere in NFM and ARR's contractual relationship.

## CONCLUSION

In conclusion, we find that the district court did not err by granting summary judgment in favor of NFM and Benchmark. Therefore, the district court's order is affirmed.

AFFIRMED.