(202 P.3d 87)
No. 99,793

BARTON J. COHEN, as Trustee of the BARTON J. COHEN REVOCABLE TRUST, and A. BARON CASS, III, as Trustee of the A. BARON CASS FAMILY TRUST, u/t/a dated March 22, 1989, as amended, *Appellants*, v. MARION BATTAGLIA, *Appellee*.

Petition for review granted January 8, 2010.

Opinion filed March 6, 2009.

*Alleen Castellani VanBebber* and *R. Pete Smith*, of McDowell, Rice, Smith & Buchanan, P.C., of Kansas City, Missouri, for appellants.

*Louis C. Accurso* and *E. Ann Wright*, of The Accurso Law Firm, of Kansas City, Missouri, for appellee.

Before STANDRIDGE, P.J., PIERRON and BUSER, JJ.

STANDRIDGE, J.: Barton J. Cohen, as trustee of the Barton J. Cohen revocable trust (the Cohen Trust), and A. Baron Cass, III, as trustee of the A. Baron Cass Family Trust under trust agreement dated March 22, 1989, as amended (the Cass Trust), appeal the dismissal of their claims of tortious interference with a contract and tortious interference with a prospective business advantage and relationship.

## Facts

The Cohen Trust and the Cass Trust filed a civil action in the Johnson County District Court against Marion Battaglia asserting the following claims: (1) tortious interference with existing contractual relations; (2) tortious interference with a prospective business advantage and relationship; and (3) specific performance of a contractual obligation. The claims against Battaglia were premised on the following factual allegations, which will be presented as described in the amended petition.

Prior to August 30, 2005, Battaglia owned a 20% interest in Baron Development Company, LLC (BDC), a Kansas limited liability company, and 2,222 shares of common stock in The Baron Automotive Group, Inc. (BAG). The remaining balance of the membership interest in BDC and the rest of the shares of common stock in BAG were owned by the Cohen Trust and Cass.

On August 30, 2005, the Cohen Trust and Cass purchased all of Battaglia's common stock in BAG. Battaglia remained an employee of the company.

At the same time as the BAG transaction, BDC redeemed Battaglia's interest in BDC, paying Battaglia $419,809 in cash and issuing him a promissory note worth $1,259,434. By way of a " 'Pledge Agreement,' " the note was secured by a 20% first priority security interest in BDC.

The promissory note provided that it would become due and payable in full if BDC or BAG were sold to an unrelated party. Pursuant to the pledge agreement, BDC further promised not to sell any portion of Battaglia's 20% security interest without Battaglia's consent. Once all of the obligations under the note were performed and the " '[t]ermination date' " of the agreement was

reached, however, Battaglia's consent to the sale of his collateral was no longer required.

After the transactions with Battaglia were completed, Cass transferred all of his interests in BDC and BAG to the Cass Trust. In October 2006, Cass and Cohen (Trustees) and BAG agreed with Group 1 Automotive, Inc. (Group 1) that (1) Trustees would sell 100% of the membership interests in BDC (which would include Battaglia's 20% security interest) to Group 1, and (2) BAG would sell all of its assets to Group 1. The parties set January 16, 2007, as the closing date for the sales. The sale of the interests in BDC to Group 1 would take place simultaneously with the payment in full of the promissory note to Battaglia; thus, Trustees took the position that Battaglia's consent to the sale was not required.

After being informed of the sale agreements, Battaglia demanded to know the purchase price and other details. Cohen refused on the basis that Battaglia was not a " 'seller' " under the sale agreements, the transactions with Group 1 were confidential, and disclosure of the information might jeopardize the agreements. Battaglia disputed these assertions, arguing that, as the president of BAG and because of his security interest in BDC, he was entitled to copies of the contracts regarding the sale agreements. In response, counsel for Trustees and BAG countered that Battaglia was not entitled to see the documents relating to the sales agreements because Battaglia was neither a shareholder of BAG, a member of BDC, nor a director of either entity, and thus had no interest in either BAG or BDC except as the holder of a promissory note.

Battaglia knew that the closing with Group 1 was scheduled for January 16, 2007. On January 12, 2007, Louis C. Accurso, Battaglia's attorney, filed a civil action on behalf of Battaglia in the circuit court of Jackson County, Missouri, naming Cohen, the Cohen Trust, Cass, BAG, and BDC as defendants (the Missouri action). That same day, Accurso faxed to Group 1's general counsel a copy of the Missouri action with the following notation: " 'Please find enclosed a file-stamped copy of a lawsuit filed today on behalf of Marion Battaglia. If you have any questions or comments, please do not hesitate to contact me.' "

At the time the Missouri action was filed, Group 1 had no ownership interest in BDC or BAG. Also, Group 1's general counsel was neither counsel for, nor a registered agent of, BDC or BAG. According to Trustees, Accurso's conduct in "[s]ending the letter and a copy of the Petition for the Missouri Action served no purpose except to interfere with the sale transactions."

As a result of Accurso's actions, Group 1 contacted counsel for Trustees and expressed reservation about closing the sales. Specifically, Group 1 refused to close without altering the agreements to include a supplemental indemnification agreement from BDC, the Cohen Trust, and the Cass Trust. Also, Group 1 required that $2,500,000 be placed in escrow for the benefit of Group 1. Trustees incurred substantial attorney fees in complying with Group 1's additional demands.

On January 16, 2007, the sale agreements closed, with Trustees receiving $2,500,000 less than the agreed-upon purchase price due to the escrow. Simultaneous with the closing, Trustees paid the promissory note in full, which Battaglia accepted. Shortly afterwards, Trustees filed this lawsuit against Battaglia setting forth claims for tortious interference with a contract, tortious interference with a business expectancy, and specific performance. Battaglia filed a motion to dismiss the tortious interference claims, which the district court ultimately granted. In a separate order, the court thereafter declined to exercise subject matter jurisdiction over the claim for specific performance. Trustees appeal.

### Subject Matter Jurisdiction

At oral argument, Battaglia argued for the first time on appeal that the district court's dismissal of this cause of action without prejudice did not constitute a final judgment from which Trustees can appeal. Whether jurisdiction exists is a question of law over which an appellate court's scope of review is unlimited. *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 369, 130 P.3d 560 (2006). Subject matter jurisdiction may be raised at any time, whether for the first time on appeal or even on the appellate court's own motion. *Vorhees v. Baltazar*, 283 Kan. 389, 397, 153 P.3d 1227 (2007). If the record shows there is no jurisdiction for an appeal, the appeal

must be dismissed. *State v. Harp*, 283 Kan. 740, 746, 156 P.3d 1268 (2007).

Kansas appellate courts may only exercise jurisdiction over appeals from district court as allowed by statute and, therefore, do not have discretionary power to entertain appeals from all district court orders. *Flores Rentals v. Flores*, 283 Kan. 476, 480-81, 153 P.3d 523 (2007). K.S.A. 2008 Supp. 60-2102a sets forth those orders and decisions of a district court over which this court has jurisdiction. K.S.A. 2008 Supp. 60-2102a(a)(4) allows jurisdiction over "[a] final decision in any action, except in an action where a direct appeal to the supreme court is required by law." Trustees contend that the district court's dismissal without prejudice constituted a final judgment, while Battaglia asserts that it did not.

A final decision generally disposes of the entire merits of the case and leaves no further questions or the possibility of future directions or actions by the court. The term " 'final decision' " is self-defining and refers to an order that definitely terminates a right or liability involved in an action or that grants or refuses a remedy as the final act in the case. *Flores*, 283 Kan. at 481-82.

The question presented here is whether an involuntary dismissal without prejudice, made upon the defendant's motion, constitutes a final judgment. Previous Kansas case law has addressed similar, but not identical, questions. In *Brower v. Bartal*, 268 Kan. 43, 45-46, 990 P.2d 1235 (1999), and *Bain v. Artzer*, 271 Kan. 578, 579-81, 25 P.3d 136 (2001), the Kansas Supreme Court determined that an order granting a voluntary dismissal without prejudice, with conditions for refiling, on plaintiff's motion did not constitute a final judgment.

However, in a 2004 unpublished opinion, a panel of this court determined there was sufficient finality for appellate jurisdiction where an action was involuntarily dismissed without prejudice, but the plaintiff claimed potential prejudice from the dismissal because a second lawsuit might not relate back and, therefore, could be subject to dismissal based on the statute of limitations. *Nelson v. Kaw Valley Center, Inc.*, No. 90,510, unpublished opinion filed April 9, 2004. It seems reasonable to extrapolate and apply a rule from *Nelson* that where a case has been involuntarily dismissed

without prejudice, there will be appellate jurisdiction of such dismissal only where the plaintiff contends that he or she will suffer some real prejudice from the dismissal. A dismissal without prejudice contemplates by its very nature the possibility of refiling an action that is exactly or substantially the same as the action dismissed. Judicial economy is not served by allowing an appeal from such a dismissal when a plaintiff does not show that he or she will be adversely affected by the dismissal.

Such a rule is similar to rules applied in other jurisdictions. See *LeBlang Motors, Ltd. v. Subaru of America, Inc.*, 148 F.3d 680, 687 (7th Cir. 1998) (An involuntary dismissal without prejudice was not a " 'final decision' " for purposes of determining appellate jurisdiction unless plaintiff could not file another complaint.); *B.C. Inv. Co. v. Throm*, 650 P.2d 1333, 1335 (Colo. App. 1982) (Dismissal of a complaint without prejudice is generally not a final and appealable order, unless circumstances indicate that the action cannot be saved, such as due to operation of a statute of limitations.); *Chromalloy American v. Elyria Found.*, 955 S.W.2d 1, 4 (Mo. 1997) ("[A] dismissal without prejudice that a plaintiff may cure by filing another suit in the same court is not a final judgment from which an appeal may be taken.").

Here, at oral argument in this case, Trustees maintained prejudice from the district court's dismissal since a second lawsuit may not relate back and could be subject to dismissal based upon the statute of limitations. Although we decline to address the potential for prejudice, Trustees' assertions at oral argument that the potential was real is an adequate showing of the potential prejudice for purposes of the jurisdictional issue. Accordingly, we hold under the unique facts of this case that sufficient finality has been shown to invoke our appellate jurisdiction because Trustees face the real potential for prejudice from an involuntary dismissal without prejudice.

### Standard Of Review

Upon appellate review of a district court's order granting a motion to dismiss for failure to state a claim, an appellate court is required to assume that the facts alleged by the plaintiff are true,

along with any inferences reasonable to be drawn therefrom. The court must also decide whether those facts and inferences state a claim on the theories presented by the plaintiff and also on any other possible theory. *McCormick v. Board of Shawnee County Comm'rs*, 272 Kan. 627, Syl. ¶ 1, 35 P.3d 815 (2001), *cert. denied* 537 U.S. 841 (2002). Although the court must accept the plaintiff's description of what occurred, the court is not required to accept conclusory allegations on the legal effects of events the plaintiff has set out if these allegations do not reasonably follow from the description of what happened, or if these allegations are contradicted by the description itself. 272 Kan. 627, Syl. ¶ 10.

### *Analysis*

Battaglia submitted three arguments to the district court in support of his motion to dismiss the tortious interference claims: (A) Trustees failed to allege that any contract actually was breached; (B) Trustees failed to allege Battaglia had requisite knowledge of the terms within the contract; and (C) Trustees' claims were premature and not yet actionable. Although the district court denied the motion to dismiss based on the first and second arguments, the court granted the motion to dismiss based on the third argument. On appeal, Trustees seek to reverse the district court's decision with regard to the third argument and affirm the district court's decision with regard to the first and second arguments.

### A. *Did Trustees Adequately Allege That Group 1 Breached The Contract Or Interfered With A Prospective Business Advantage Or Relationship?*

With respect to Trustees' claim of tortious interference with a contract, Battaglia's motion to dismiss argued that Trustees failed to allege breach. In addition, with respect to Trustees' claim of tortious interference with prospective business advantage or relationship, Battaglia argued that Trustees' amended petition failed to allege that Trustees' relationship with Group 1 did not continue or that the expectancy was not realized. The district court considered and rejected Battaglia's breach of contract argument but failed to separately address Battaglia's argument concerning inter-

ference with a prospective business advantage or relationship. These arguments will be addressed separately below.

## 1. Allegations Of Breach Of Contract

In their amended petition, Trustees alleged that, as a result of Accurso's actions on behalf of Battaglia, Group 1 "refused to close without altering the Sale Agreements." Trustees further alleged that they modified the sales agreements to comply with Group 1's demands, and the sales ultimately closed on schedule.

On appeal, Battaglia cites *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1164 (D. Kan. 1990), for the proposition that an action for interference with a contract does not extend to any adverse impact or increased burden, short of breach. Battaglia claims compliance with Group 1's demands merely caused an adverse impact or placed an increased burden on Trustees.

Battaglia's citation to *Pizza Management* is unpersuasive. In *Hawkinson v. Bennett*, 265 Kan. 564, 601, 962 P.2d 445 (1998), the defendants relied on *Pizza Management* and made virtually the same argument as Battaglia makes here, which our Supreme Court rejected. The Supreme Court noted that, under Kansas law, anticipatory repudiation is a breach of contract which authorizes the nonbreaching party to bring an immediate action. *Hawkinson*, 265 Kan. at 601.

Applying *Hawkinson*, Trustees have alleged sufficient facts that, if true, would constitute anticipatory repudiation by Group 1. Therefore, the district court did not err in ruling that Trustees had adequately alleged a breach of contract.

## 2. Allegations Of Interference With Business Expectancy Or Relationship

Battaglia also argues that Trustees failed to allege that their business relationship was not continued. For support, Battaglia cites to a case from the Superior Court of Connecticut, *Elkman v. McCarthy*, 2001 WL 1868928 (2001) (unpublished opinion). In *Elkman*, the property manager of a condominium sent a letter to a prospective purchaser of a condominium unit warning that liability could be imposed on the prospective purchaser for nonconforming

doors installed by the seller. As a result of this letter, which "almost killed the deal," the seller was required to place $3,000 in escrow to cover the cost of replacing the doors in case the property manager took action against the prospective purchasers. 2001 WL 1868928, at *1. The seller sued the property manager for tortious interference with business relations, but the court entered judgment for the property manager. After noting that the closing did in fact take place, the court ruled with no further analysis that the plaintiff had failed to establish any of the elements of tortious interference with a contract or business relations. 2001 WL 1868928, at *2.

While *Elkman* clearly favors Battaglia, the court's analysis in that case is weak. The mere fact the sale closed may demonstrate the relationship between Group 1 and Trustees did not terminate, but that fact alone does not show that Trustees fully realized their expectancy of future economic benefit. Trustees alleged that they were required to pay substantial attorney fees and that the sale price was reduced as a result of Accurso's conduct. Therefore, we find Trustees adequately pled that Battaglia interfered with their business expectancy.

## B. Allegations Regarding Battaglia's Knowledge Of The Terms Within The Prospective Sales Agreement

The district court refused to grant Battaglia's motion to dismiss on the ground that Trustees were required to allege that Battaglia had knowledge of the specific terms of the contract or the business relationship. On appeal, Battaglia asserts that knowledge of the particular terms of the contract and business relationship should be found essential to Trustees' claims. Battaglia's argument turns on his assertion that Trustees alleged nothing more than a modification of the terms of the sales agreements. Battaglia reasons that he should not be held liable for interfering with something of which he had no knowledge.

With his assertion of modification, Battaglia has merely recast his argument above that Trustees failed to allege a breach of the contract or termination of the business relationship. As discussed earlier, this argument was not persuasive.

Moreover, we find no Kansas case law to support Battaglia's claim. In articulating the elements of tortious interference with a contract and tortious interference with a business relationship or advantage, our Supreme Court has never held that knowledge of the precise terms of a contract or business relationship is necessary to maintain either of these actions. See *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423-24, 77 P.3d 130 (2003).

Turning to other jurisdictions, the court in *Don King Productions, Inc. v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. 1990), cited New York law and held: "In a tortious interference action, a plaintiff is not required to prove that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue. [Citation omitted.] It is enough that the defendant who interfered have '[k]nowledge of the *existence* of the contract' . . . ." A similar proposition of law was articulated in *Kelly v. Galveston County*, 520 S.W.2d 507, 513 (Tex. App. 1975), where the court held: "It is not necessary that a defendant in a case of interference with contract rights have actual knowledge of the contract and its terms. It is enough that the defendant had facts from which a reasonable person would conclude the existence of a contract. [Citation omitted.]"

The only case to be found stating otherwise is *Ebasco Services Inc. v. Pennsylvania Power & L. Co.*, 402 F. Supp. 421 (D.C. Pa. 1975). According to *Ebasco Services Inc.*, the Pennsylvania Supreme Court's decision in *Klauder v. Cregar*, 327 Pa. 1, 192 A. 667 (1937), "is explicit in requiring that the offending party have knowledge not only of the existence of the contractual relationship, but also of the terms of that contract which conferred upon the claimant the rights allegedly interfered with." 402 F. Supp. at 453. However, this characterization of the court's holding in *Klauder* is somewhat exaggerated. In *Klauder*, the plaintiff claimed the defendant maliciously interfered with a contract. The Pennsylvania Supreme Court held that the plaintiff had properly stated a cause of action against the defendant. 327 Pa. at 10. In reaching this conclusion, the court distinguished a similar case from Massachusetts in which a contrary result was reached. According to the court, the defendant in the Massachusetts case had no knowledge of the contract's

specific terms, while in the present case the defendant possessed particular knowledge and could be held liable. 327 Pa. at 7.

The distinction made in *Klauder* certainly suggests that particular knowledge is a prerequisite to liability in Pennsylvania but does not go so far as to explicitly require it. Moreover, we could find no case from a Pennsylvania state court that recognized the characterization of *Klauder* as set forth in *Ebasco Services Inc.* Accordingly, we find the district court did not err in finding that Trustees were not required to allege that Battaglia had knowledge of the specific terms of the contract or the business relationship in order to adequately state a claim upon which relief could be granted.

## C. Did The District Court Err In Dismissing The Tortious Interference Claims Based On A Finding That The Claims Were Premature?

Although the district court denied Battaglia's motion to dismiss based on the arguments set forth above, the court granted the motion to dismiss on grounds that the tortious interference claims were premature. Tortious interference with a contract seeks to preserve existing contracts, while tortious interference with a prospective business advantage or relationship seeks to protect future or potential contractual relations. Despite these differences, both torts are similar in that they are predicated on malicious conduct by the defendant. *Burcham*, 276 Kan. at 423-25.

To that end, the district court found—as a matter of law—that it was the filing of the Missouri lawsuit by Battaglia that made up the malicious conduct upon which Trustees based their claims. Relying on *Eddy's Toyota of Wichita, Inc. v. Kmart Corp.*, 945 F. Supp. 220, 225 (D. Kan. 1996), the district court went on to find that in order to prove tortious interference based on the filing of the Missouri lawsuit, Trustees would be required to establish the elements of a malicious prosecution claim, which includes a requirement that the lawsuit terminated in the plaintiffs' favor. Since the Missouri action had not yet terminated, the court concluded that Trustees' tortious interference claims were premature and thus could not survive dismissal.

On appeal, as they did in the district court, Trustees argue the malicious conduct upon which they base their claims is not the act of filing the Missouri lawsuit, but the *faxing* of a copy of the Missouri lawsuit to Group 1. In rejecting this argument, the district court held that filing a lawsuit is deemed to provide notice to the public of its existence; thus, sending a copy of the lawsuit to a member of the public cannot be a separate and distinct instance of malicious conduct upon which to base a claim of tortious interference. The district court further held that the Restatement of Torts provides that a tortious interference claim cannot be predicated on a threat to file, or the actual filing, of a good faith lawsuit to protect a legal right.

Based on the district court's conclusions of law, the following issues are now presented for determination on appeal: (1) whether Trustees' amended petition specifically alleged Trustees' claims were predicated on the separate and distinct act of *faxing* a copy of the Missouri action to Group 1; (2) whether Trustees' amended petition properly alleged that, but for Group 1's receipt of the fax from Battaglia, Group 1 would have closed the deal without requiring the agreement be modified; and (3) whether the predicate act of faxing a copy of the Missouri lawsuit otherwise states a cause of action for tortious interference.

### 1. Did The Petition Sufficiently Allege Faxing As A Separate and Distinct Predicate Act?

"A rule of liberal construction applies when judging whether a claim has been stated." *Montoy v. State*, 275 Kan. 145, 148, 62 P.3d 228 (2003). Under this rule, a plaintiff is entitled to have the petition interpreted liberally in his or her favor with respect to any indefiniteness or uncertainty in its allegations and to have all inferences reasonably to be drawn therefrom resolved in his or her favor. See *City of Andover v. Southwestern Bell Telephone*, 37 Kan. App. 2d 358, 362, 153 P.3d 561 (2007).

According to Trustees, their amended petition clearly specified that the *sole* basis of their claims was Accurso's conduct in faxing a copy of the Missouri action to Group 1. This is debatable. In their amended petition, Trustees alleged that Battaglia (through Ac-

curso) filed the Missouri action and faxed a copy of that action to Group 1. In the very next paragraph, Trustees claimed: *"Sending the letter and a copy of the Petition for the Missouri Action* served no purpose except to interfere with the sale transactions." (Emphasis added.) This italicized text certainly suggests that Trustees were relying on *faxing* as the tortious conduct. Notably, however, Trustees alleged later in the amended petition that "as a result of Battaglia's actions," "through the actions of Accurso," and "[a]s a result of Battaglia's wrongful conduct," Group 1 refused to close the sales agreements without altering them. If Trustees intended to forego the *filing* of the Missouri action as a basis of liability for their claims, they certainly could have done so more clearly. But, given we must liberally construe the petition to determine whether a claim has been stated, we find the petition sufficiently alleges faxing the lawsuit as a separate and distinct predicate act.

### 2. Did Trustees' Amended Petition Properly Allege That, But For Receiving The Fax, Group 1 Would Have Closed The Deal Without Requiring The Agreement To Be Modified?

The district court held that "filing a lawsuit is deemed to give notice to the world of its existence. Under those circumstances, it is impossible for this Court to see how mailing a copy of the lawsuit would add anything." For insight as to what the district court meant by these words, we turn to statements made by the district judge at the hearing on Battaglia's motion to dismiss:

"[T]he filing of the petition in Missouri imparts notice by operation of law. And so, I don't see how the sending of that letter does anything that the filing of the petition did not do. I understand how, as a practical matter, it may have caused the buyers to take some action, but as a legal matter, I can't see that the sending of the letter had any effect that the filing of the lawsuit did not have."

From this excerpt, it appears the district court concluded that, because filing the Missouri action made the lawsuit public information, Trustees would be unable to prove that, "but for" Accurso's conduct in *faxing* the lawsuit, Group 1 would have closed the deal as originally agreed.

Tortious interference with a prospective business advantage or relationship explicitly requires "but for" causation. To succeed on that claim, Trustees must prove that, *except for the conduct of Battaglia,* Trustees were reasonably certain to have continued the relationship or realized the expectancy with Group 1. See *Burcham,* 276 Kan. at 423. And, although tortious interference with a contract does not explicitly require "but for" causation, our Supreme Court has construed "but for" causation as an element of the tort. See *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 168-69, 872 P.2d 252 (1994) (adopting elements of tort as set forth in 45 Am. Jur. 2d, Interference § 39, p. 314). Accordingly, both causes of action for tortious interference require a plaintiff to establish "but for" causation.

The question thus presented is whether Trustees sufficiently alleged "but for" causation in their amended petition. To that end, Trustees alleged several times that Group 1 refused to close the sales transactions *as a result* of Accurso's conduct. Given the conclusory nature of this allegation, however, and the failure to set forth any facts to support such an allegation, we find these allegations insufficient.

In stating the elements of their claim for tortious interference with a prospective business advantage or relationship, Trustees alleged that, but for Battaglia's conduct, they were reasonably certain to close the sales transactions as structured. This again, however, is a conclusory allegation, and Trustees never alleged any specific facts to support it. For example, Trustees never alleged that, but for Accurso's conduct in faxing a copy of the Missouri action to Group 1, Group 1 would not have obtained knowledge of the Missouri action prior to closing.

Apparently recognizing they failed to sufficiently allege "but for" causation in their amended petition, Trustees argue on appeal they were entitled to a reasonable inference that, but for Accurso's conduct in faxing a copy of the Missouri action to Group 1, Group 1 would have been ignorant of any lawsuits and would have had no incentive to breach its sales agreements with Trustees. Battaglia opposes any such inference.

First, Battaglia maintains the inference is "meaningless" because, if it were true, Trustees could "sue the paper boy who delivers a newspaper that reported on the filing of the lawsuit." We disagree. A lawsuit against the paper boy would only prevail if all the other elements of tortious interference with a contract and tortious interference with a prospective business advantage or relationship were proven, including knowledge and intent. See *Burcham*, 276 Kan. at 423-24. If such a lawsuit against a paper boy seems ridiculous, it is because a paper boy would not have the requisite knowledge of the contractual relations or business expectancy and the requisite intent to interfere, not because the information conveyed was public.

Battaglia's second argument against an inference of "but for" causation is that it conflicts with other allegations in Trustees' amended petition. Specifically, Battaglia points to the allegation that the Chicago Title Insurance Company would be handling the closing of the sale. According to Battaglia, the title company's report "would have shown all matters of public record, thereby dispelling any notion that Group 1 would not have been made aware of the lawsuit if [Accurso] had not mailed a copy to them." Again, we disagree. Trustees never alleged that a report would be made or what such a report would contain. Battaglia's argument consists of nothing but speculation and inferences drawn *against* Trustees' favor. As indicated earlier, all reasonable inferences must be drawn in Trustees' favor, not against it. See *City of Andover*, 37 Kan. App. 2d at 362.

Moreover, an inference that Group 1 would have closed the sales agreements as originally structured but for Accurso's actions follows reasonably from Trustees' allegation that Group 1 failed to close the sales agreements as a result of Accurso's conduct. Accurso's alleged conduct included transmitting the fax. Taking Trustees' allegations and all reasonable inferences as true, we find the amended petition sufficiently alleged that, but for receiving the fax, Group 1 would have closed the deal without requiring the agreement to be modified. See *McCormick*, 272 Kan. 627, Syl. ¶ 10.

### 3. Does The Predicate Act Of Faxing A Copy Of The Missouri Lawsuit Otherwise State A Cause Of Action For Tortious Interference?

The district court held Battaglia could not be held liable for Accurso's conduct in faxing a copy of the Missouri action to Group 1 because Accurso's conduct was protected pursuant to the Restatement (Second) of Torts § 773 (1979). This section provides:

"One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Restatement (Second) of Torts § 773.

In other words, if a person believes that his or her interest will be destroyed by the performance of the contract, § 773 permits that person to intentionally interfere with the contract by asserting *in good faith* a legally protected interest or by threatening *in good faith* to protect the interest by appropriate means. See Restatement (Second) of Torts § 773. Citing to this section as support for dismissal, the district court reasoned: "If threatening to file a good faith lawsuit is not grounds for a tortious interference case, and filing a good faith lawsuit is not grounds for a tortious interference claim, it is impossible for this Court to see how saying, 'Look, I have filed this lawsuit' could be grounds either."

Notably, we are not persuaded by the court's reasoning. This is because § 773 protects only those actions which were taken *in good faith* and where the person believed the action was necessary to preserve a legally protected interest. See Restatement (Second) of Torts § 773. In their amended petition, Trustees specifically alleged that Accurso's conduct in faxing a copy of the Missouri action to Group 1 *"served no purpose* except to interfere with the sale transactions." (Emphasis added.) Assuming that this allegation and all reasonable inferences are true, Accurso's conduct on behalf of Battaglia was taken neither in good faith nor for the purpose of preserving a legally protected interest. Accordingly, we conclude

the district court's reliance on § 773 in dismissing Trustees' tortious interference claims was misplaced.

Notwithstanding this conclusion, the district court's decision to dismiss should be affirmed. See *Cagle Limestone Co. v. Kansas Power & Light Co.*, 190 Kan. 544, 550, 376 P.2d 809 (1962) (district court's dismissal of action may be affirmed if correct result was reached, even if district court assigned erroneous grounds for its decision). We find the district court should be affirmed because tortious interference claims cannot be predicated on the defendant's communication of *truthful* information. See Restatement (Second) of Torts § 772(a) (1979). Section 772 provides:

> "One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
> "(a) truthful information, or
> "(b) honest advice within the scope of a request for the advice."

Comment b under § 772 speaks unequivocally:

> "*b. Truthful information.* There is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another. The interference in this instance is clearly not improper. This is true even though the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another. It is also true whether or not the information is requested. Compare § 581A, on the effect of truth in an action for defamation."

Our research reveals that no Kansas state appellate court has cited to § 772(a). At least two panels of our court, however, appear to have considered and approved the general concept underlying this section of the Restatement without actually citing to it. In *Taylor v. International Union of Electronic Workers, et al.*, 25 Kan. App. 2d 671, 678, 968 P.2d 685 (1998), *rev. denied* 267 Kan. 889 (1999), the plaintiff asserted claims of defamation and tortious interference with a prospective business relationship based on the defendant's communication of allegedly false and defamatory statements. The court held that the success of the plaintiff's case turned on whether the statements were true or false. According to the court, if the statements were true, "plaintiff [had] little to complain

about." 25 Kan. App. 2d at 678. This language was quoted with approval in *Meyer Land & Cattle Co. v. Lincoln County Conservation Dist.*, 29 Kan. App. 2d 746, 751, 31 P.3d 970 (2001), *rev. denied* 273 Kan. 1036 (2002), although that panel's analysis implied that liability for tortious interference could still be imposed if the defendant committed misconduct in conveying truthful information. As noted previously, § 772(a) does not permit *any* liability to be imposed if the breach resulted from the communication of truthful information. See Restatement (Second) of Torts § 772, comment b.

Notably, the United States District Court for the District of Kansas twice has held that § 772 applies in Kansas. See *Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*, 1996 WL 707025, at \*11-\*12 (D. Kan. 1996) (unpublished opinion); *Green Const. Co. v. Black & Veach Engineers & Architects*, 1990 WL 58780, at \*4-\*5 (D. Kan. 1990) (unpublished opinion).

To determine whether the principle stated in § 772(a) should be recognized with this case, some context is necessary. As mentioned before, claims of tortious interference are predicated on malicious conduct by the defendant. See *Burcham*, 276 Kan. at 424-25. Thus, not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations. See *Burcham*, 276 Kan. at 425. In *Turner v. Halliburton Co.*, 240 Kan. 1, 14, 722 P.2d 1106 (1986), our Supreme Court noted that the Restatement (Second) of Torts § 767 (1979) does not speak in terms of privilege or justification; rather, the Restatement refers to tortious conduct as "improper" and sets forth the following seven factors that should be considered in determining whether a defendant's conduct meets that description: (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations between the parties.

Section 772 is one of seven specific applications of the general seven-factor balancing test found in § 767. Restatement (Second) of Torts § 767, comment b. According to the drafters of the Restatement, when one of these sections applies, the seven-factor balancing process in § 767 need not be performed. See Restatement (Second) of Torts § 767, comment j.

Simply put, we find the rule stated in § 772(a) should be adopted as the law in Kansas. In *Turner* our Supreme Court quoted the seven-factor test found under § 767. *Turner*, 240 Kan. at 14. Since § 772 is a special application of § 767, our Supreme Court has, by implication, approved of § 772. Moreover, in *Turner*, our Supreme Court declared that "[o]ccasions privileged under the law of defamation are also occasions in which interference with contractual relations may be considered justified or privileged." 240 Kan. at 13. Under the law of defamation, no liability exists for true statements. *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 598, 738 P.2d 1246 (1987). Our Supreme Court's willingness to extend the principles of defamation law to claims for tortious interference strongly supports the conclusion that § 772(a) should be adopted as the law in Kansas.

Here, Trustees have attempted to impose liability on Battaglia for Accurso's conduct in notifying Group 1 of the existence of the Missouri action. Applying § 772(a), we find Accurso's conduct on behalf of Battaglia conveyed nothing but truthful information and, thus, is not actionable. For this reason, we affirm the district court's decision to dismiss.

Affirmed.