DONALD R. HELMSTADTER, APPELLANT, V. NORTH AMERICAN BIOLOGICAL, INC., A DELAWARE CORPORATION DOING BUSINESS AS LINCOLN PLASMA CENTER, APPELLEE.

559 N.W.2d 794

Filed February 11, 1997.   No. A-95-1138.

Robert Wm. Chapin, Jr., for appellant.

Brenda S. Spilker, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee.

MILLER-LERMAN, Chief Judge, and IRWIN and SIEVERS, Judges.

SIEVERS, Judge.

Donald R. Helmstadter brought a defamation action against North American Biological, Inc. (NABI), a privately owned company doing business as Lincoln Plasma Center. Helmstadter alleged that NABI made false and inaccurate comments to other plasma centers concerning Helmstadter's eligibility to donate plasma. At trial, after the conclusion of the evidence, the Lancaster County District Court sustained NABI's motion for a directed verdict. Because Helmstadter had not been defamed, the trial court properly granted the directed verdict for NABI, and we therefore affirm.

## FACTUAL BACKGROUND

NABI owns approximately 80 plasma centers around the United States and in Germany, including Lincoln Plasma Center in Lincoln, Nebraska, where individuals donate their plasma for money. NABI's plasma centers send samples of each donor's plasma by Federal Express to the NABI laboratory in Miami, Florida, for screening tests for diseases such as human immunodeficiency virus (HIV), "ALT," hepatitis C, and hepatitis B. Screening tests are nondiagnostic tests; in other words, they do not diagnose a donor with a particular disease. If a sample is

reactive, or positive, to the hepatitis B surface antigen, the donor's plasma center is notified and the donor's plasma is destroyed. The plasma center then informs the donor of the test results. A donor who tests positive is then classified as "permanently deferred" or "permanently rejected," and the donor so classified is forever prevented from donating blood or plasma. However, a reactive result to a screening test does not necessarily mean that the donor has contracted or is infected with hepatitis B.

Helmstadter, 66 years of age at trial, began donating his plasma at Lincoln Plasma Center in 1986, using the money to supplement his income. On December 22, 1992, Helmstadter signed NABI's "Automated Plasmapheresis" form, which was in essence an acknowledgment and consent form. The form apprised Helmstadter that after each donation, some of his plasma would be tested for hepatitis, among other diseases. The form advised Helmstadter that if his test results were unsuitable, his name would be entered into NABI's donor rejection files and consequently he would be unable to donate blood or plasma at "ours or other facilities." The form further advised Helmstadter that NABI might be required to report any unsuitable test results to public health agencies.

On July 19, 1993, Helmstadter donated plasma, and a sample was sent to Miami to be tested in NABI's laboratory. On July 28, 1993, Wanda Rowen, manager of Lincoln Plasma Center, received a call from the lab and was told that Helmstadter's plasma had tested positive for the hepatitis B surface antigen. Lincoln Plasma Center immediately marked "Permanent Reject D/T Unsuitable Test Results 7-28-93" on Helmstadter's donor chart. Helmstadter returned to Lincoln Plasma Center on July 29, 1993, where he was privately informed of the test results by Joseph Shankland, an NABI employee known as a physician substitute. Shankland requested that Helmstadter sign a confidential notice form acknowledging that he had tested positive to the hepatitis B surface antigen. The top half of the notice informed Helmstadter that the test was not a diagnostic test for hepatitis B and that false positives might occur. A false positive is a positive result despite the absence of the disease. The notice advised Helmstadter not to donate blood or plasma in the future,

advised him that his name had been entered in NABI's donor deferral files, and advised him that NABI might be required to provide his test results to public health agencies. The bottom half of the notice was a statement of understanding, reading as follows: "I hereby state that I have received this written Confidential Notice for my abnormal screening test, and it has been explained to me. I understand that the result of this test is not a diagnosis of any infection, and that I should seek further medical evaluation." Helmstadter became upset, refused to sign the statement of understanding, and left the center.

Helmstadter went to the Lincoln-Lancaster County Health Department, apparently the same day, and requested that he be tested for hepatitis B. The health department took a sample of Helmstadter's blood and told him that they needed the top half of the confidential notice from Lincoln Plasma Center. Consequently, Helmstadter returned to Lincoln Plasma Center that afternoon. Shankland finished the confidential counseling session with Helmstadter and informed him that the test conducted was only a screening test, not a diagnostic test, and that consequently there was the possibility of a false positive test result. Shankland also informed Helmstadter that he was not allowed to donate blood or plasma in the future and that Shankland might have to notify public health agencies. Helmstadter signed the statement of understanding and wrote "with protest" next to his signature. Helmstadter then returned the top half of the form to the health department. On approximately July 30, 1993, Helmstadter received a written report from the health department stating that he had tested negative for hepatitis B.

On August 16, 1993, Helmstadter went to University Plasma Center, a competitor of Lincoln Plasma Center, and attempted to donate plasma. University Plasma Center drew a serum sample from Helmstadter for testing. According to Helmstadter, when he returned to University Plasma Center on August 23, he was told that his test results were favorable and that he could donate plasma. The record, however, indicates that University Plasma Center did not send any blood for hepatitis B surface antigen testing on August 16. When University Plasma Center asked Helmstadter if he had donated plasma in the past weeks,

Helmstadter replied that he had, at Lincoln Plasma Center. In front of Helmstadter, Angela Render of University Plasma Center telephoned Lincoln Plasma Center. Render was told that Helmstadter was not eligible to donate due to lab results. Render, however, was not told the specific lab result or disease which had caused Helmstadter to be permanently deferred. Render then informed Helmstadter that he would not be allowed to donate because he had been permanently deferred due to lab results. As of trial, Helmstadter said he had not since attempted to donate plasma.

On August 30, 1993, the Lincoln-Lancaster County Health Department wrote Helmstadter a letter stating that they had received a report from NABI that he had tested positive for the hepatitis B surface antigen. According to Carolyn Mitchell, communicable disease coordinator for the health department, if an individual in Lancaster County tests positive for hepatitis B, the health care provider or blood or plasma collection agency is required by law to notify the health department.

In his second amended petition, Helmstadter alleged that Lincoln Plasma Center informed University Plasma Center that Helmstadter "was not able to donate blood as the defendant [sic] had tested positive for Hepatitis-B and/or was Permanently Deferred." Helmstadter further alleged that NABI published the results to its other centers and "all other plasma collection agencies in the State of Nebraska and throughout the United States." Helmstadter sought damages for loss of income, back wages, and mental pain and anguish, as well as general damages and attorney fees. In its answer, NABI alleged that the statement made to University Plasma Center was true and that all communications were made in good faith and were privileged.

At trial, Roxanne Stanard, director of quality assurance and regulatory affairs for NABI, testified that NABI is governed by the U.S. Food and Drug Administration (FDA), among other agencies. Stanard testified that the FDA requires plasma centers to have a written set of operating procedures. Stanard specifically testified that NABI's standard operating procedures had been approved by the FDA. With regard to NABI's donor check policy, standard operating procedure directs staff as follows:

13.2 Share only the following information whenever donor check phone calls are made:

13.2.1 <u>Permanent Rejection</u> for cross-donation or any reason related to failure to meet donor health and suitability criteria (unsuitable test results, medical history, etc.).

. . . .

13.2.5 Do not communicate deferral or rejection information that is related to discretionary reasons, or identify other specifics (types of unsuitable test, high risk groups, etc.)

NABI's standard operating procedures further state that persons with reported test results of reactive hepatitis B surface antigen are permanently rejected. In such a case, the standard operating procedure directs staff as follows:

9.1 Exercise a high degree of caution in handling any inquiries from, or reports to outside sources due to concern for the confidentiality of all donor-related information.

9.2 In the event of any inter-center reporting (either written or via telephone), required reporting to local health agencies, or inquiries from any source, only the following information may be released:

9.2.1 Verification of the individual having donated at the center.

9.2.2 Dates of donation.

9.2.3 Classification of either Temporary Deferral or Permanent Rejection. The reason for permanent rejection must never be released unless mandated by state or local laws.

Stanard testified that the proper response to an inquiry from another center regarding a donor who had tested positive for the hepatitis B surface antigen would be that the donor is permanently rejected due to unsuitable test results.

Dr. John Hutchison, director of quality assurance and regulatory affairs and a licensed laboratory director for NABI's Miami facility, also testified at trial. Dr. Hutchison testified that plasma collection laboratories are highly regulated. Regarding the stringency of the tests used by NABI, Dr. Hutchison testified:

And they [the FDA] insist that the testing be very rigorous and very sensitive so that you test to be borderline and actually pass the borderline of positivity in the general population. What FDA want [sic] to assure is that we cast a net so broad that we don't miss anybody in terms of positivity for hepatitis and consequently, we do occasionally have false positives but as a result, we catch everyone that on a screening test that would be —possibly be a positive for hepatitis B in the general population.

Dr. Hutchison further explained NABI's screening test procedures. If a donation is reactive to the hepatitis B surface antigen test, the FDA requires the test be confirmed. The repeat or confirmatory testing is performed by senior technicians with extensive experience. If any of the duplicate tests are reactive, the FDA requires that the specimen be classified as reactive and the results be reported to the plasma center. Dr. Hutchison commented: "At this point you must stop and actually form a barrier between this individual and the United States blood supply . . . ." Dr. Hutchison referred to NABI as a "gatekeeper with regard to protecting the U.S. plasma supply from unforeseen eventualities."

Dr. Hutchison testified that all three tests performed on Helmstadter's sample, including the confirmatory testing described above, showed that Helmstadter was reactive to the hepatitis B surface antigen. Dr. Hutchison explained that when all three tests are positive, the FDA requires that the donor be permanently deferred. Concerning Helmstadter's tests, Dr. Hutchison testified that there was "no question in my mind that it was accurate." Dr. Hutchison further testified that Helmstadter was correctly classified as reactive.

According to Dr. Hutchison, due to the sensitivity of NABI's tests, false positives occur from time to time. Dr. Hutchison estimated that the chance of a false positive result occurring in three screening tests, like Helmstadter's sample was subjected to, is approximately 1 in 10,000. Dr. Hutchison reiterated that NABI's screening and confirmatory tests do not actually diagnose individuals for the disease. He explained that an individual with a false positive for hepatitis B would be someone who has

been exposed to hepatitis but has fought it off, similar to an individual who has fought off a cold.

After resting its case at trial, NABI made a motion to dismiss or, in the alternative, for a directed verdict. The court sustained NABI's motion for a directed verdict. Helmstadter now appeals to this court.

## ASSIGNMENTS OF ERROR

Helmstadter asserts that the district court erred in (1) granting NABI's motion for a directed verdict and (2) finding that the statements published by NABI were truthful and that NABI had a qualified privilege to publish the statements.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion from the evidence. *Ochs v. Makousky*, 249 Neb. 960, 547 N.W.2d 136 (1996); *Wolf v. Walt*, 247 Neb. 858, 530 N.W.2d 890 (1995).

Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996); *New Light Co. v. Wells Fargo Alarm Servs.*, 247 Neb. 57, 525 N.W.2d 25 (1994).

## ANALYSIS

Helmstadter contends that because there was evidence that the communication made between Lincoln Plasma Center and University Plasma Center was false, the district court erred in directing a verdict in favor of NABI. Helmstadter specifically points to the results of the Lincoln-Lancaster County Health

Department test which showed that Helmstadter tested negative for hepatitis B. But we are unpersuaded, because at the most basic level it cannot be said that the health department results make the NABI screening test false, nor do the health department results make what Lincoln Plasma Center told University Plasma Center defamatory.

■ Defamation is language the nature and obvious meaning of which is to impute to a person the commission of a crime or to subject the person to public ridicule, ignominy, or disgrace. *Young v. First United Bank of Bellevue*, 246 Neb. 43, 516 N.W.2d 256 (1994). In an action for a libel or slander, it shall be sufficient to state, generally, that the defamatory matter was published or spoken of the plaintiff, and if the allegation be denied, the plaintiff must prove on the trial of the facts, showing that the defamatory matter was published or spoken of the plaintiff. Neb. Rev. Stat. § 25-839 (Reissue 1995). In proving a publication, the plaintiff is not required to show that slander was made known to the public generally. *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990). It is enough that the plaintiff shows that it was orally communicated to a single person other than the plaintiff. *Id.*

In his petition, Helmstadter alleged that NABI published the results to University Plasma Center, its other centers, and "all other plasma collection agencies in the State of Nebraska and throughout the United States." At trial, the only evidence of publication was (1) the communication made by Lincoln Plasma Center to University Plasma Center that Helmstadter had been permanently deferred due to his lab results and (2) the notification of the Lincoln-Lancaster County Health Department. Helmstadter does not complain of the notification of the health department. At trial and on appeal, Helmstadter is solely concerned with the communication made to University Plasma Center.

■ Spoken or written words are slanderous or libelous per se only if they falsely impute the commission of a crime involving moral turpitude, an infectious disease, or unfitness to perform the duties of an office or employment, or if they prejudice one in his or her profession or trade or tend to disinherit one. *K Corporation v. Stewart*, 247 Neb. 290, 526 N.W.2d 429 (1995);

*Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991). In a slander per se action where the statement is clear and unambiguous, the issue the jury is to determine is not whether a statement is defamatory but whether the statement was made by the defendant. *McCune v. Neitzel, supra.* In the instant case, it is undisputed that Lincoln Plasma Center made the communication to University Plasma Center, and the communication arguably imputes an infectious disease to Helmstadter.

But the truth itself and alone shall be a complete defense in a defamation action unless it shall be proved by the plaintiff that the publication was made with actual malice, and actual malice shall not be inferred or presumed from publication. Neb. Rev. Stat. § 25-840 (Reissue 1995). A defendant who relies upon the truth of the defamatory matter published by the defendant has the burden of proving it. *Bartels v. Retail Credit Co.*, 185 Neb. 304, 175 N.W.2d 292 (1970).

In a defamation action, truth or conditional privilege must be pled as an affirmative defense. *McCune v. Neitzel, supra.* In its answer, NABI alleged that any and all statements it made indicating that Helmstadter was permanently deferred from donating were true. NABI further alleged that all communications concerning Helmstadter were made in good faith and were privileged.

In the instant case, the evidence is virtually undisputed. Helmstadter tested positive for the hepatitis B surface antigen in NABI's initial screening test and two confirmatory tests. The FDA requires that donors be permanently deferred when three tests show a positive reaction. Thus, Lincoln Plasma Center was required to permanently defer Helmstadter.

With regard to the communication in question, the evidence shows that NABI followed its FDA-approved standard operating procedure. Lincoln Plasma Center told only University Plasma Center that Helmstadter was permanently deferred due to lab results, a statement which was entirely accurate. Lincoln Plasma Center did not tell them that Helmstadter was infected with hepatitis B. In fact, NABI did not know whether Helmstadter had actually contracted hepatitis B, because the screening tests were nondiagnostic. The fact than an individual may test positive to the hepatitis B surface antigen does not nec-

essarily mean that the individual has in fact contracted hepatitis B. A false positive result may occasionally occur due to the sensitivity of the screening tests, and it is this sensitivity that safeguards the U.S. plasma supply from any possibility of infection. We agree with the trial judge's oral finding that NABI had no choice but to make the communication. However, the communication was entirely true.

■ Moreover, the communication carried with it a qualified privilege. Whether a qualified privilege exists is a matter of law. *Young v. First United Bank of Bellevue*, 246 Neb. 43, 516 N.W.2d 256 (1994). Conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which the author has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty. *Turner v. Welliver,* 226 Neb. 275, 411 N.W.2d 298 (1987). A communication between those sharing a common interest is conditionally privileged. *Id.* Obviously, two companies buying plasma have a common interest in the safety of plasma and risks posed by particular donors. NABI's FDA-approved standard operating procedures clearly allow for the publication or transmission of the classification of a donor between plasma companies in order to protect the safety of the U.S. plasma supply. Such communication is essential to the safety of the plasma supply. Thus, the communication, in accordance with FDA-approved standard operating procedures, was privileged.

■ Even if the publication is true or a qualified privilege exists, the plaintiff may still recover if the plaintiff proves that the publication was made with actual malice. See, § 25-840; *Young v. First United Bank of Bellevue, supra*; *Turner v. Welliver, supra.* Malice has been defined as hate, spite, or ill will. *Young v. First United Bank of Bellevue, supra*; *Turner v. Welliver, supra.* Actual malice will not be presumed from the communication. See § 25-840. Moreover, where a qualified privilege exists, as is true here, it is necessary to allege the existence of actual malice. 53 C.J.S. *Libel and Slander* § 139 (1987).

Although whether a publication was maliciously made is a question of fact for the jury, see *Pokrok Zapadu Publishing Co. v. Zizkovsky*, 42 Neb. 64, 60 N.W. 358 (1894), Helmstadter neither alleged nor proved actual malice as defined in *Turner v. Welliver, supra*. In fact, during argument to the court on the motion for a directed verdict, Helmstadter's counsel conceded that there was no evidence of malice.

## CONCLUSION

For purposes of a motion for a directed verdict, a court must assume the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed; nevertheless, where there is no credible evidence upon which a jury can properly proceed to find a verdict for that party, the trial court should direct a verdict. *Turner v. Welliver, supra*. The uncontradicted evidence shows that the communication made by Lincoln Plasma Center to University Plasma Center was true, was privileged, and was not maliciously made. The decision of the district court to direct a verdict in favor of NABI is therefore affirmed.

AFFIRMED.