771 N.W.2d 121 (2009)
278 Neb. 405
Roxana RECIO, appellant,
v.
Michelle EVERS, appellee.
No. S-07-1338.
Supreme Court of Nebraska.
August 28, 2009.
*124 Kevin J. McCoy, of Smith, Gardner, Slusky, Lazer, Pohren & Rogers, L.L.P., Omaha, for appellant.
Thomas F. Hoarty, Jr., of Byam & Hoarty, P.C., L.L.O., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
*125 GERRARD, J.
Roxana Recio, a professor at Creighton University (Creighton), was placed on probation and required to attend counseling after Creighton's sexual harassment committee found merit in a sexual harassment complaint made by Recio's colleague, Michelle Evers. Recio sued Evers for tortious interference with a business relationship, but the district court entered summary judgment against Recio. The primary question presented by this appeal is whether there is a genuine issue of material fact as to whether Evers' sexual harassment complaint was justified. Based on the record presented, we find that Evers' sexual harassment complaint was justified because it provided truthful information to Creighton. Therefore, we affirm the judgment of the district court.

BACKGROUND
Recio was a tenured professor of Spanish in Creighton's department of modern languages and literatures (the Department). In February 2001, Evers accepted a position as a professor of Spanish in the Department, to begin in August 2001. Evers and Recio became acquainted during Evers' hiring process and began e-mailing one another. Recio's e-mails to Evers formed the basis of Evers' eventual complaint of sexual harassment. The messages were originally in Spanish or Catalan; Recio does not deny sending the messages, but the semantics of their translation and context are disputed. The following excerpts are taken from Evers' translations, because they are the only complete translations that are in the record. Any relevant disputes over translation are noted. And because of the informal style of these messages, there are various grammar, spelling, and syntax errors. Indicating each error with a "[sic]" would be distracting, so we reproduce each of the translated messages in its original form. Because they are essential to resolving this appeal, they are quoted at some length.

RECIO'S E-MAILS
The first message at issue, sent by Recio to Evers on April 16, 2001, mostly discussed the work of a particular Catalan poet who was apparently of academic interest to them. Recio also discussed her summer travel plans, however, and promised to send postcards from each of her stops. Recio wrote, "I'll write you from everywhere and you don't have to answer my postcards, of course, what I would like though would be to receive a letter from you sometime, short, but at least send me one." Recio also wrote that she would help Evers prepare articles for publication.
I would like you to publish, if you want, of course, I don't want to stick myself in your life ... but I do want to be your friend, do you understand? I hope so, because if you don't understand, you will end up hating me and I will have an attack. If I don't see you in August as we were saying this morning ... UFFF!... I think I would shoot myself in the head (think that I'm bad off in the head if you want, I don't care, but I will shoot myself).
(Emphasis in original.) Recio claims that "I don't want to stick myself in your life" is a literal translation, but that the verb would have been better translated as "`to meddle, intrude, interfere.'"
A message sent the following day was still discussing the same poet, but was more personal. Recio wrote:
The truth is, I really feel like talking to you and I don't know if I'll have time and if I'll be able to tell you all that I want.... The most important thing is to communicate and I am happy with your e-mails in any case. Of course, I haven't erased your voice from my answering *126 machine. It makes me happy and I love it. I'll leave it there a few days. I just feel like it. I'm trying hard not to call you ... but I won't do it because I don't want to take advantage of you. I was thrilled to talk to you yesterday. You already know that I don't have to tell you what I feel because you know quite well and also I am always repeating to you like a parrot.
Recio contends that "Of course" should have been translated "`[B]y the way'" and that "It makes me happy and I love it" should have been translated "`I find it funny and I like it.'" Recio claims that "I was thrilled to talk to you" would have been more accurately translated as "I enjoyed talking to you" or "I loved to talk to you." Recio also contends that "You already know that I don't have to tell you what I feel" actually contained a reference to the previous sentence, so the idea was "`[Y]ou already know that I loved to talk with you.'"
Recio's message went on to say that she had told her husband she wanted to take Evers to a particular restaurant in Spain and that "[h]e doesn't mind, he says it's fine." Recio wrote, "Let's see if we can go someday (you can bring whomever you want, but I want to bring you)." Recio also commented more on a particular poet and wrote, "I love that you're reading him and that you stay up late reading it. How great, I figured out what you like! Could you keep telling me what you like to read? I want to share with you." Recio again asked Evers to write her, and promised, "I'll send you all the e-mails that I can. You'll get tired of it, I won't. For me, you are very important." Recio concluded, "Hey, I miss you (I won't ever tell you that again, I promise). Write me when you can, okay? Don't forget. I hope the summer goes by fast (to be able to see you once and for all!)."
Another, shorter message was sent later the same day. Recio, who is a Cuban exile, asked Evers if she was "Pro-Castro." Recio asked:
Do you believe all that propaganda? It would hurt me but I would still have the same caring feelings for you. The truth is, I already care so much for you that I don't know what I would say. It would be terribly hard to discuss with you. I'll tell you seriously, you are in charge. I am at your feet, I am not a man ... (that last part is a joke)[.]
Recio concluded by promising to write later, and she did so that evening. Recio wrote:
I just called you and it surprised me that you had already read the message I sent you. But I liked that you told me that you aren't Pro-Castro, it wouldn't have mattered, but I feel much better, I confess. To tell you the truth, it would have been painful for me but I wouldn't have discussed it with you. Of course I discuss it but with you it wouldn't have made a difference. Okay, but the thing is, it was funny the way you proclaimed it. You know what I am discovering? I think that you like to laugh, you like good humor, you have a spark when you talk etc. but behind it all there is an intelligent and sensitive woman, very intelligent and sensitive and I want to discover more. Has it ever occurred to you that it is hard to meet a guy not because you are pushy, like you say, but rather for your intelligence and sensitivity? I don't know, I think that could be it.
Recio says that "you have a spark" actually means "'[you are] witty and sharp.'" Recio's message continues:
What I am missing is the directions. Look: I write you and later, if you would like, you write me, those things that they call "traditional" letters. *127 What do you think? I only ask that if I write you four, you write me one, nothing more. It's that in Barcelona I'll see my e-mail two or three times a week, but in Sitges maybe once, and that's even going to be hard because I'm going to miss you (I'm not going to keep saying it, honestly). You don't understand because you see me like some nice person who tortures you with e-mails and who you will work with, you are kind, polite, etc but for me it is different, Michelle, I feel so much for you, don't you notice? Don't you see that I talk to you not just to pass the time, but rather because it makes me happy? That's how it is, and of course, I will miss you and the other type of mail will help me to be near you even if you don't answer me. It's something caring, affectionate that doesn't have to do with anything else. What's more, when you say things like what you said about [a particular writer], I find it interesting to talk to you. I'm going to save your message. I have to read it better. Okay, so that you have to wait a little I'll send the addresses from there, that way, you don't have to worry about saving them or anything. Let's see if some day you have half of the affection that I feel for you. Let's see. I doubt it but oh well. Today people are just plain savage (that's a joke)[.]
Recio says that the translated words "I feel so much for you" are too strong and should have been translated as "`I have developed some affection for you'" and that the phrase "it makes me happy" actually meant "`I feel comfortable.'"
Recio continued the message by writing:
In reference to Spain I love what you say: it's true, we'll coincide there sometime and it will be great. Sometimes I'm afraid that if you would come you would be disappointed. We'll do everything possible for that not to happen. But it's true: there is a lot of life to live and good times to be had and above all: introduce you to Juan who will just faint when he sees you[.]
Recio asked Evers to "[t]ell me what books you want me to bring you and tell me what I can do to not miss you so much." Recio concluded by describing how she had told a friend about Evers, explaining:
I want her to help me (and everyone else too) to not miss this wonderful girl who knows tons of stuff and who writes and thinks like few people do ... I've never missed Omaha or the U.S., this time, I will. You see and you're telling me that I'm going to have a great time. I'll have a good time but you know, you won't be there. I told you that I'm obsessive (but don't freak out, I'm not like Jeffrey Dohmer, is that how you write his name?) and when I really like someone I'm like that, this doesn't usually happen to me.
Recio asserts that "when I really like someone" should have been translated as "`when I am impressed by someone.'"
Recio's next message, sent the next day, began by asking:
Where are you? The truth is, I've been going on all day without any news from you and it's making me crazy. Have you heard of a drug called "Michelle," I have an addiction to it now. It's just that I'm not going to be here much longer to talk with my pal and I'm a little down about it.
Recio says that "it's making me crazy" actually meant "`I am annoyed.'"
Recio went on to write that she was not disappointed with Evers' desire to marry and start a family:
You should know by now after all we've talked about that it would have to be something really huge to disappoint *128 me. It would be impossible. On the contrary: what worries me is how good I feel with you ... do you thin[k] that I should separate myself a little from you to see you more distantly? Do you think it would be good if I were to disappear in Spain and show up again in August? I don't know. I admire you and I love talking to you and leaving is making me feel badly. Maybe you would advise me to take some distance... I'm going to make you crazy. Pardon me for talking like that but I'm a little tired.
I don't know if I should have told you that. But I know you'll understand and give me your opinion, you have nothing to lose. Maybe it's just my tiredness and lack of control and courtesy on my part. Hey, I'm sorry. Please, don't get mad, okay? Before getting mad, think about this person talking to you who really holds you in esteem and who doesn't have bad intentions. Okay? But what do you want, I feel phenomenal with you. Yes.
Recio's next message, sent the next day, was much shorter. Recio wrote:
You are right, I'm exaggerating. Don't pay any attention to me. The truth is, I deserve a cake (I've behaved in a silly way)[.] Thanks for scolding me, I think that in Spain I'll get back to my common senses.... Can I write you these days even if you don't answer because you're busy? ... Okay! Come on, don't get mad.
That afternoon, Recio wrote:
I answered your message and you didn't answer me, especially knowing what I said to you yesterday.... I thought that you weren't answering me because you were busy writing your dissertation. You know what? Yes, I am nervous, impatient and what's more I get desperate with people who I care for, but these defects, I think they are small in the face of some of the virtues that I've shown. I think you need a different type of person different than me....
Your hard attitude has insulted me. You know, it's better just to be colleagues in our work and that's it. Don't give me any lessons and I'm sorry for having been so sincere and sentimental with you. But I don't want to deal with a person so tough who forgets all my good traits for one little error. Thanks for the punch. We'll see each other (what choice do we have?) in August.
The final e-mail was sent several days later, apparently responding to another message from Evers. Recio wrote:
I was offended because you told me you were writing your dissertation, you embarrassed me (by not answering my email) and it hurt me because I was busting my head to figure out how to get used to having less contact with you (since it would be hard in Sitges to have e-mail, etc). I don't know, maybe it wasn't that big of a deal. I don't know. But what I do know is that, I don't understand you and you don't understand me. It would be better to be in person to see if we can communicate. I'm not mad anymore but I'm scared, because I'm not like all these proud imbeciles here. They have fucked me enough around here. I want peace with you and the best is to wait to see each other because from a distance I am afraid.
Recio claims that "you embarrassed me" actually meant "`you told me a big lie'" and that "maybe it wasn't that big of a deal" actually meant "`maybe it was not a lie.'" Recio also claims that the profanity attributed to her no longer carries its literal meaning in Spanish and is no longer particularly profane; rather, it means "`to *129 annoy, pester.'" (For example, an equivalent English idiom might be to "screw with" someone.)
Recio concluded:
Thanks for wishing me a good trip. The truth is, I need to rest. We'll see each other in August and with peace, and pardon me if I reacted like that but it's just that it hurt me like a pair of swords in my side, I don't know why but that's what I felt. Let's just leave it at that. It isn't important. Good luck with your dissertation and now let's be in peace and harmony, nothing ever happened. You can blame my emotional immaturity or whatever you like.
But everything's alright, eh? Nothing happened. August is just around the corner.

EVERS' SEXUAL HARASSMENT COMPLAINT
Evers began teaching at Creighton in the fall of 2001 and did not have much contact with Recio for several months. Recio was on sabbatical during the 2002-03 academic year. Recio returned in the fall of 2003.
It is apparent from the record that the faculty in the Department did not get along with one another. On February 10, 2004, the Spanish section of the Department held a separate meeting. The Department chair, Thomas Coffey, attempted to preside over the meeting, and Recio objected because Coffey was primarily a French professor. The meeting became contentious, and Evers walked out, returned, then walked out again. On February 12, Recio sent an e-mail to Coffey and Creighton administrators, complaining about Evers' conduct at the meeting. On February 13, Evers and three other members of the Spanish faculty sent a letter to Coffey complaining about Recio's conduct at the meeting and other alleged emotional outbursts by Recio.
A few days later, Evers provided Coffey, the dean of Creighton's college of arts and sciences, and the Creighton legal department with copies of Recio's 2001 e-mails to her. Evers later contacted the chairperson of Creighton's sexual harassment committee and Creighton's affirmative action officer. On March 17, 2004, Evers filed a complaint with the sexual harassment committee, attaching the e-mails and her translations of them. The sexual harassment complaint also set forth a "Timeline of Incidents with ... Recio," describing the events listed above, and other instances in which Evers alleged Recio had behaved inappropriately. The complaint also stated that Recio's "frequent public outbursts" created a hostile environment for anyone required to work with her and that because Evers did not want to have any further contact with Recio, Evers suggested that "the only adequate solution would be to dismiss ... Recio from the faculty and remove her presence from" the Department.
The sexual harassment committee held five meetings and heard evidence from Evers, Recio, several other faculty members, and one student. Other members of the faculty reviewed the e-mails in Spanish. A member of the faculty of Creighton's college of business administration, who was a friend of Recio's and apparently fluent in Spanish, said that the e-mails could be "`explained away by culture and effusiveness." ' But members of the Department's Spanish faculty believed that the e-mails were inappropriate, even accounting for cultural differences.
The committee found that Recio's messages were inappropriate, noting that "[w]itnesses from various Hispanic cultures including Cuba, Venezuela, Spain, and Puerto Rico differed with ... Recio's interpretation that culture could be used to *130 explain away" the e-mails and had described them as "inappropriate, shocking, and of a sexual nature." The committee found that "[a]t best, the emails in their intensity and obsessiveness are ominous and caused ... Evers great distress." The committee also noted several other incidents, including a sexual harassment complaint against Recio and "difficulties" that had allegedly occurred when Recio had been at another university, and personal behavior toward other new faculty members. The committee noted that "departmental witnesses described her in the following terms: obsessive, a bully, aggressive, irrational, ... demanding, creates conflict, stalking, retaliates, rages, verbal violence, explosive, forceful and creates a hostile work environment."
The committee concluded that
the emails constituted sexual harassment and a hostile environment by displaying a pattern of obsessive behavior which created discomfort and distress for ... Evers. The committee believes the implicit sexual overtones and the aggressive, demanding tone of the emails reflected a need by ... Recio to create a sense of power in this relationship. It is inconceivable that a senior member of the Creighton ... faculty would write these words to a new faculty member.
The committee also found that the February 12, 2004, letter that Recio wrote, complaining about Evers, "borders on retaliation" for not responding to Recio's advances. And the committee found that Recio "displayed a pattern of obsessive, aggressive and retaliatory behavior" toward Evers and that Recio's "long-standing unprofessional behavior has contributed to a dysfunctional and hostile academic environment for the entire department that continues constantly to be addressed by the administration." The committee unanimously recommended to Creighton's president, Fr. John P. Schlegel, S.J., that Recio's employment be immediately terminated.
Schlegel agreed with many of the committee's conclusions, but decided, in a letter dated May 12, 2004, that the case was "much more than a sexual harassment case" and stated that his "recommendations for action reflect that fact." Schlegel concluded that "Recio would benefit from a program of psychological counseling and educational programs on communication, appropriate interactions with others, teamwork, etc." Schlegel placed Recio on a term of probation of a little more than a year and directed her to have no contact or communication with Evers. Recio was directed to commence a psychological counseling program, at her cost, and to attend educational programs recommended by the dean of Creighton's college of arts and sciences.

DISTRICT COURT PROCEEDINGS
On May 4, 2006, Recio filed a complaint against Evers in the district court, alleging a claim for tortious interference with a business relationship. Recio alleged that the e-mails supporting Evers' sexual harassment claim had been translated "in a misleading manner in order to create a distorted impression of suggestive content." Recio alleged that "Evers' spurious allegations of sexual harassment were made with malicious intent and without justification in order to damage and disrupt Recio's contractual employment...." And Recio alleged that "[a]s a proximate [result] of Evers' interference with Recio's contractual relations," Recio was put on probation and suffered, among other things, lost salary, costs of counseling, damage to her reputation, emotional distress, and "renegotiation terms and conditions different from [those of] similarly situated colleagues." In her answer, as an *131 affirmative defense, Evers alleged that her submission of the sexual harassment complaint was privileged.
The district court granted Evers' motion for summary judgment, finding "no evidence that the [sexual harassment] complaint filed by [Evers] was made in bad faith or with malice." The court also stated that "it would defeat the sexual harassment policy of Creighton ... to allow an employee who in good faith files a valid sexual harassment complaint to be sued for tortious interference with employment by the individual who harassed her." Thus, the court stated that Evers' actions "were privileged and that no genuine issues of material fact exist." The court dismissed Recio's claim with prejudice.

ASSIGNMENTS OF ERROR
Recio assigns, as consolidated, that the district court erred in (1) finding that Evers' sexual harassment complaint was privileged as a matter of law, (2) finding that there were no disputed material facts or inferences deducible from those facts as to whether Evers acted in bad faith or with malice in charging Recio with sexual harassment, and (3) claiming that there was no evidence that Evers interfered with Recio's employment or caused her harm.

STANDARD OF REVIEW
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all favorable inferences deducible from the evidence.[2]

ANALYSIS

TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
Before discussing Recio's arguments in detail, it will be helpful to review some of the basic propositions of law relating to a claim for tortious interference with a business relationship. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[3] One of the basic elements of tortious interference with a business relationship requires an intentional act which induces or causes a breach or termination of the relationship.[4]
It is not entirely clear, in this case, whether Recio is claiming that Evers' act of interference was directed at Creighton or at Recioin other words, whether Evers' alleged act of interference made Creighton breach its employment relationship with Recio or made Recio's performance of her employment obligations more *132 difficult.[5] For purposes of our analysis, we assume that Recio stated a claim for relief with respect to breach of the employment relationship, even though Creighton has clearly not terminated Recio's employment and Recio only pled that her performance of her obligations under that agreement had been made more difficult.[6] We need not resolve this ambiguity, because we conclude that in any event, Evers' alleged act of interference was justified.

JUSTIFICATION FOR PROVISION OF TRUTHFUL INFORMATION
In order to be actionable, interference with a business relationship must be both intentional and unjustified.[7] An intentional, but justified, act of interference will not subject the interferer to liability.[8]
We have expressly adopted the seven-factor balancing test of the Restatement (Second) of Torts § 767 for use in determining whether interference is "unjustified" under Nebraska law.[9] Factors to consider in determining whether interference with a business relationship is "improper" include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.[10]
These are the important factors to be weighed against each other and balanced in arriving at a judgment; but they do not exhaust the list of possible factors. The issue in each case is whether or not the interference is improper under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision depends upon a judgment and choice of values in each situation.[11]
Section 772 of the Restatement contains a "special application of the general test" stated in § 767.[12] It provides:
One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
(a) truthful information, or
(b) honest advice within the scope of a request for the advice.[13]
This is true even if the facts are marshaled in such a way that they speak for themselves and are immediately recognized as a basis for breaching the contract.[14] Simply put, if the information provided *133 is truthful, the interference is not "improper."[15]
Based on that reasoning, the general rule is that an action for tortious interference with a business relationship will not lie where the substance of the alleged interference is the provision of truthful information.[16] Society has a strong interest in promoting the transmission of truthful information, and the factors enumerated in § 767 weigh in favor of permitting such conduct without liability. When truthful information provides the basis for a termination of a business relationship, the resulting liability, if any, should rest on the party who made an informed choice to terminate the relationshipnot the party who provided the facts upon which that decision was based.
Although we have never expressly adopted the principle expressed in § 772(a), we implicitly endorsed it in DeLay First Nat. Bank & Trust Co. v. Jacobson Appliance Co.,[17] in which we held that a creditor's communications with a debtor's suppliers did not support a claim for defamation or tortious interference with a business relationship when the communications at issue were truthful. We also implicitly adopted § 772(b), protecting the giving of honest advice, in Wiekhorst Bros. Excav. & Equip. v. Ludewig.[18] And we have expressly adopted other "special application[s]" of § 767.[19] Simply stated, we have already adopted § 767 and its related sections; the special application of § 767 set forth in § 772(a) is not only well recognized and sensible, but necessary for our law to be consistent.[20]
Therefore, we now expressly hold that as stated in § 772(a), a person does not incur liability for interfering with a business relationship by giving truthful information to another.[21] Such interference is not improper, even if the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking a contract or refusing to deal with another.[22]
In this case, Recio's brief sets forth, at length, supposed factual inconsistencies and improper behavior on the part of Evers, other Department faculty, and Creighton administrators. Generally, Recio's brief describes a narrative in which Evers' sexual harassment complaint is only part *134 of a larger campaign of persecution directed at Recio by Creighton and her colleagues in the Department. As noted above, the record reflects a substantial amount of discord in the Department. But it does not support the construction put upon it by Recio. Most pertinently, there is nothing in the record that substantially contradicts the factual basis of Evers' sexual harassment complaint.
And despite Recio's attempts to broaden the issues in this case, our analysis is limited by Recio's pleadings to the content and effect of Evers' sexual harassment complaint. The purpose of pleadings is to frame the issues upon which a cause of action is to be tried, and the issues in a given case will be limited to those which are pled.[23] And the only act Evers is alleged to have committed that affected Recio's employment relationship with Creighton was the sexual harassment complaint. To the extent that Recio's pleading can be read to allege that Evers made Recio's performance of her job obligations more difficult, such a claim fails because there is no evidence that Recio suffered a pecuniary loss from her alleged inability to perform any contractual duties.[24] In other words, the only damages alleged in Recio's pleadings that can be attributed to Evers' alleged interference with Recio's employment resulted from the sexual harassment complaint. So, we focus on whether the sexual harassment complaint was justified under the principles of § 772(a).
The essence of Recio's argument is the contention that "Evers made false, inflated and fabricated claims against Recio."[25] But Recio's brief, and the record as a whole, are notably short on instances in which Evers' complaint was demonstrably false. Most importantly, Recio does not deny sending the e-mails that formed the basis and bulk of the complaint. Recio said that she did not clearly remember the content of the e-mails. She also denied that they had sexual overtones and objected to their lack of context, i.e., Evers' failure to retain or provide other e-mails that Evers and Recio had sent to one another. And Recio complains about the "misleading manner" of Evers' translations of the e-mails.
But these arguments do not establish any genuine issue of material fact about whether Recio sent the e-mails at issue. While Recio claimed not to remember their content clearly, she did not deny sending them and generally accepted them as presented. Recio denied that the e-mails constituted "sexual harassment" within the meaning of the relevant Creighton sexual harassment policy, but that is in essence a legal conclusion, not a denial of the underlying conduct that was the gravamen of Evers' complaint. And Recio's speculation about Evers' translation of the e-mails is unsupported. Recio's criticisms about various words and phrases are largely semanticRecio's alternative translations, in our view, are not meaningfully different. And Evers' sexual harassment complaint also included the original, untranslated e-mailsthereby defeating the suggestion that Evers intended to mislead the sexual harassment committee about what Recio had actually written.
We also are not persuaded by the suggestion in Recio's brief that Evers' e-mails showed that the content of Recio's messages *135 was "in essence no different from that of Evers' correspondence perhaps effusive or at times melodramatic to an Anglo reader, but in no way threatening or sexually harassing."[26] Those e-mails have not been reproduced here, because, contrary to Recio's suggestion, we do not find them to be particularly relevant. They are friendly and often conclude with traditional Catalan salutations meaning such things as "a big hug" or "a kiss." But they do not resemble Recio's messages in any relevant respect, and the suggestion that they are similar is an exaggeration.
Nor is there evidence that the "Timeline of Incidents with ... Recio" attached to the sexual harassment complaint was substantially untruthful. Recio testified that she did not recall some of the events, and she interpreted some of the events differently. But she did not materially dispute any of them. Instead, Recio attempts to manufacture falsehoods out of discrepancies in the record on facts such as whether the e-mails were sent before or after Evers accepted Creighton's offer of employment, whether she told anyone at Creighton about the e-mails before February 2004, and whether she communicated with Creighton's affirmative action officer before or after she contacted the chair of the sexual harassment committee. But those inconsistencies are either inconsequential or explained by the record. Creighton did not place Recio on probation because of any of those facts. Creighton placed Recio on probation because of a series of e-mails that Recio did not deny sending and a sequence of events that Recio did not materially dispute. The factual disputes that Recio notes are simply not issues of material fact.
At oral argument, Recio also intimated that Evers' testimony to the sexual harassment committee formed some basis for liability. This argument is unavailing, for many of the reasons set forth above. Evers' testimony was neither materially inconsistent with her complaint nor denied in any relevant respectbut most significantly, her committee testimony was not placed at issue by Recio's pleadings, nor was it clearly implicated by Recio's appellate brief. We reject Recio's belated attempt to bring it into contention.
In short, we find that Evers' sexual harassment complaint was justified, as providing truthful information to Creighton. The incidents upon which Creighton's disciplinary decision was based were, according to Recio, misunderstood. But they were not denied, and the record evidences no genuine issue of material fact about whether those incidents actually took place. The district court did not err in concluding that Evers' complaint was justified, and therefore, we find no merit to Recio's first assignment of error.

ACTUAL MALICE
In support of her second assignment of error, Recio argues generally that there is a genuine issue of material fact as to whether Evers' complaint was made maliciously. In support, she relies on Restatement sections that relate to defamation actions and generally describe the ways in which a conditional privilege may be abused.[27] And in Nebraska, by statute, truth is a defense to a claim of libel or slander "unless it shall be proved by the plaintiff that the publication was made with actual malice."[28] Recio contends there is evidence that Evers' complaint, even if truthful, was motivated by actual *136 malice. So, Recio argues, Evers' complaint was not justified.
But Recio's argument in that regard is unavailing. To begin with, while actual malice may defeat a conditional privilege defense against a defamation claim, it is not at all clear that the same principles apply to a justification defense against a claim of tortious interference with a business relationship. We have, in fact, specifically disapproved any suggestion that an intentional but justified interference may subject the interfering party to liability.[29] And while a malicious motive is a factor which may be considered in determining whether interference is unjustified, it is generally insufficient standing alone to establish that fact under § 767 of the Restatement.[30] In general, § 772(a) does not permit any liability to be imposed for the communication of truthful information.[31]
But even if we consider Recio's actual malice argument, it is unsupported by the record. Actual malice may not be presumed from a communication.[32] And actual malice, in this context, is defined as "hate, spite, or ill will."[33] Actual malice requires that the defendant act with a desire to harm the plaintiff that is unrelated to a desire to protect the acting party's rights and which is not reasonably related to the defense of a recognized property or social interest.[34] That standard is not met hereaside from Recio's speculation, there is insufficient evidence to support a finding that Evers' complaint was entirely motivated by malice. Recio's opinion as to Evers' motive will not support a finding that Evers acted with actual malice and does not preclude summary judgment in Evers' favor.[35] Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for purposes of summary judgment.[36]
Recio relies on the allegation in her pleadings that Evers acted maliciously and seems to suggest that whether a defendant acted maliciously is always a question for the trier of fact precluding summary judgment. But while actual malice is generally an issue of fact,[37] there is a difference between an "issue of fact" and a "genuine issue as to any material fact" within the meaning of Neb.Rev.Stat. § 25-1332 (Reissue 2008) (emphasis supplied).[38] The primary purpose of the summary judgment procedure is to pierce the allegations in the pleadings and show conclusively that the controlling facts are other than as pled.[39] Simply alleging an issue of fact is insufficient to defeat a motion for summary *137 judgment.[40] Therefore, the district court did not err in finding no genuine issue of material fact relating to actual malice. Recio's second assignment of error is without merit.

REMAINING ISSUES
Having concluded that Evers is not liable to Recio based on Evers' sexual harassment complaint, we need not consider whether the complaint caused any harm to Recio. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.[41] And in support of her argument that her sexual harassment complaint was justified, Evers relied on a conditional privilege that some courts have applied to sexual harassment complaints.[42] In view of our analysis above, we need not discuss whether we would adopt such a privilege.[43]
Finally, we note Recio's argument that Creighton's procedures for handling Evers' sexual harassment complaint were flawed. At oral argument, Recio characterized the Creighton sexual harassment committee as a "kangaroo court." It is not at all clear how this argument relates to Recio's claim against Evers or provides any basis for a finding of liability. If Creighton treated Recio unfairly in resolving Evers' sexual harassment complaint, that would support a claim against Creighton, not Evers. And Recio's claims against Creighton were brought by and decided against her in federal court.[44]

CONCLUSION
We conclude that a person cannot incur liability for interfering with a business relationship by giving truthful information to another. In this case, Recio's claim for tortious interference with a business relationship rested on Evers' sexual harassment complaint, and the record establishes that the material allegations of Evers' complaint were truthful. And even if actual malice can defeat a defense that interference with a business relationship was justified, there is insufficient evidence in the record to show that Evers' sexual harassment complaint was motivated by actual malice. Therefore, the district court correctly concluded that Evers' sexual harassment complaint was justified. The court's judgment is affirmed.
AFFIRMED.
NOTES
[1] Schuyler Co-op. Assn. v. Sahs, 276 Neb. 578, 755 N.W.2d 802 (2008).
[2] Id.
[3] Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008).
[4] Wiekhorst Bros. Excav. & Equip. v. Ludewig, 247 Neb. 547, 529 N.W.2d 33 (1995).
[5] See Pettit v. Paxton, 255 Neb. 279, 583 N.W.2d 604 (1998).
[6] But see, e.g., George A. Fuller Co. v. Chicago Col. of Ost. Med., 719 F.2d 1326 (7th Cir. 1983). Cf. Pettit, supra note 5.
[7] Aon Consulting, supra note 3.
[8] Wiekhorst Bros. Excav. & Equip., supra note 4.
[9] See, Restatement (Second) of Torts § 767 (1979); Huff v. Swartz, 258 Neb. 820, 606 N.W.2d 461 (2000).
[10] Aon Consulting, supra note 3.
[11] See id.
[12] See Restatement, supra note 9, § 772, comment a. at 50.
[13] Restatement, supra note 9, § 772.
[14] Id., comment b. See, also, W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 129 (5th ed. 1984).
[15] See id.
[16] See, e.g., Worldwide Primates, Inc. v. McGreal, 26 F.3d 1089 (11th Cir.1994); Tiernan v. Charleston Area Medical Center, 203 W.Va. 135, 506 S.E.2d 578 (1998); Dyer v. Bergman & Associates, Inc., 657 A.2d 1132 (D.C.App.1995); Four Nines Gold, Inc. v. 71 Const., Inc., 809 P.2d 236 (Wyo.1991); Montrone v. Maxfield, 122 N.H. 724, 449 A.2d 1216 (1982); Cohen v. Battaglia, 41 Kan. App.2d 386, 202 P.3d 87 (2009); Kutcher v. Zimmerman, 87 Hawai`i 394, 957 P.2d 1076 (Haw.App.1998); Savage v. Pacific Gas and Elec. Co., 21 Cal.App.4th 434, 26 Cal.Rptr.2d 305 (1994); Liebe v. City Finance Company, 98 Wis.2d 10, 295 N.W.2d 16 (Wis.App. 1980).
[17] DeLay First Nat. Bank & Trust Co. v. Jacobson Appliance Co., 196 Neb. 398, 243 N.W.2d 745 (1976).
[18] Wiekhorst Bros. Excav. & Equip., supra note 4.
[19] See, Miller Chemical Co., Inc. v. Tams, 211 Neb. 837, 320 N.W.2d 759 (1982), disapproved on other grounds, Matheson v. Stork, 239 Neb. 547, 477 N.W.2d 156 (1991); Restatement, supra note 9, §§ 768 and 772, comment a. at 50.
[20] See, Cohen, supra note 16; Liebe, supra note 16.
[21] See, Savage, supra note 16; Restatement, supra note 9, § 772, comment b. at 50.
[22] See Restatement, supra note 9, § 772, comment b.
[23] Destiny 98 TD v. Miodowski, 269 Neb. 427, 693 N.W.2d 278 (2005).
[24] See, Pettit, supra note 5; Restatement, supra note 9, § 766A.
[25] Brief for appellant at 47.
[26] Id. at 32.
[27] See Restatement, supra note 9, § 600 et seq.
[28] Neb.Rev.Stat. § 25-840 (Reissue 2008). See, also, Neb. Const. art. 1, § 5.
[29] Matheson, supra note 19.
[30] Huff, supra note 9.
[31] See Cohen, supra note 16.
[32] See, Helmstadter v. North Am. Biological, 5 Neb.App. 440, 559 N.W.2d 794 (1997); § 25-840.
[33] Young v. First United Bank of Bellevue, 246 Neb. 43, 48, 516 N.W.2d 256, 259 (1994). Accord Turner v. Welliver, 226 Neb. 275, 411 N.W.2d 298 (1987).
[34] In re Estate of Albergo, 275 Ill.App.3d 439, 656 N.E.2d 97, 211 Ill.Dec. 905 (1995). See, also, Huff, supra note 9; Tams, supra note 19.
[35] See, Young, supra note 33; White v. Ardan, Inc., 230 Neb. 11, 430 N.W.2d 27 (1988).
[36] Marksmeier v. McGregor Corp., 272 Neb. 401, 722 N.W.2d 65 (2006).
[37] See Helmstadter, supra note 32.
[38] New Tek Mfg. v. Beehner, 270 Neb. 264, 702 N.W.2d 336 (2005).
[39] Id.
[40] See id.
[41] Concrete Indus. v. Nebraska Dept. of Rev., 277 Neb. 897, 766 N.W.2d 103 (2009).
[42] See, e.g., Cole v. Chandler, 752 A.2d 1189 (Me.2000); Vickers v. Abbott Laboratories, 308 Ill.App.3d 393, 719 N.E.2d 1101, 241 Ill.Dec. 698 (1999).
[43] See Concrete Indus., supra note 41.
[44] See Recio v. Creighton University, 521 F.3d 934 (8th Cir.2008), affirming No. 8:06CV361, 2007 WL 1560323 (D.Neb. May 29, 2007).